PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———————

No. 08-4034

———————

FRANCIS J. FARINA, individually and on behalf
of all those similarly situated

v.

NOKIA INC.; NEC AMERICA;
ERICSSON WIRELESS COMM., INC.;
MOTOROLA, INC.; SPRINT PCS, L.P.;
AUDIOVOX COMMUNICATIONS CORPORATION;
NEXTEL COMMUNICATIONS
OF THE MID-ATLANTIC,  INC.;
MATSUSHITA CORPORATION OF AMERICA,
also known as PANASONIC CORPORATION;
PHILIPS ELECTRONIC NORTH AMERICA CORP.;
QUALCOMM INCORPORATED
also known as QUALCOMM, INC;
SAMSUNG TELECOMMUNICATIONS AMERICA, L.P.;
SANYO NORTH AMERICA,  INC. also known as
SANYO NORTH AMERICA GROUP;
SONY ELECTRONICS, INC.;

AT&T WIRELESS SERVICES, INC.;
CELLCO PARTNERSHIP,
also known as VERIZON WIRELESS;
CINGULAR WIRELESS LLC, also known as
SOUTHWESTERN BELL WIRELESS formally known as
SOUTHWESTERN BELL MOBILE SYSTEMS, NC.;
CELLULAR ONE GROUP,
also known as CELLULAR ONE;
VOICESTREAM WIRELESS CORPORATION,
also known as VOICESTREAM WIRELESS;
LG ELECTRONICS MOBILECOMM U.S.A.., INC.;
CELLULAR TELECOMMUNICATION
INDUSTRY ASSOCIATION, also known as TIA;
JOHN DOES NOS. 1-100

Francis J. Farina,
Apellant

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
D.C. Civil Action No. 06-cv-0724
(Honorable John R. Padova)

Argued April 19, 2010
Before: SCIRICA, AMBRO
and ALARCÓN[*], *Circuit Judges*.

(Filed: October 22, 2010)

KENNETH A. JACOBSEN, ESQUIRE (ARGUED)
12 Orchard Lane
Wallingford, Pennsylvania 19086

MICHAEL D. DONOVAN, ESQUIRE
Donovan Searles
1845 Walnut Street , Suite 1100
Philadelphia, Pennsylvania 19103

JOSEPH A. O'KEEFE, ESQUIRE
O'Keefe & Sher
15019 Kutztown Road
Kutztown, Pennsylvania 19530
        Attorneys for Appellant

DAVID C. FREDERICK, ESQUIRE (ARGUED)
Kellogg Huber Hansen Todd Evans & Figel
1615 M Street, N.W., Suite 400
Washington, D.C. 20036

---

[*]The Honorable Arthur L. Alarcón, United States Circuit Judge for the Ninth Judicial Circuit, sitting by designation.

SEAMUS C. DUFFY, ESQUIRE
Drinker Biddle & Reath
One Logan Square
18th & Cherry Streets
Philadelphia, Pennsylvania 19103
     Attorneys for Appellees,
     AT&T Wireless Services, Inc.
     n/k/a New Cingular Wireless Services, Inc.;
     Cingular Wireless LLC n/k/a AT&T Mobility LLC

JOHN BEISNER, ESQUIRE
Skadden Arps Slate Meagher & Flom
1440 New York Avenue, N.W.
Washington, D.C. 20005

ROBERT C. HEIM, ESQUIRE
RICHARD D. WALK, JR., ESQUIRE
Dechert
Cira Centre, 18th Floor
2929 Arch Street
Philadelphia, Pennsylvania 19104
     Attorneys for Appellee,
     Cellco Partnership d/b/a Verizon Wireless

ANDREW G. McBRIDE, ESQUIRE
JOSHUA S. TURNER, ESQUIRE
Wiley Rein
1776 K Street, N.W.

Washington, D.C. 20006
Attorneys for Appellees,
Cellco Partnership d/b/a Verizon Wireless;
Nokia Inc.

DANIEL T. FITCH, ESQUIRE
Stradley Ronon Stevens & Young
2600 One Commerce Square
2005 Market Street
Philadelphia, Pennsylvania 19103

JOHN B. ISBISTER, ESQUIRE
Tydings & Rosenberg
100 East Pratt Street, 26th Floor
Baltimore, Maryland 21202
Attorneys for Appellee,
Samsung Telecommunications America, LLC

SUSAN K. HERSCHEL, ESQUIRE
Hoyle Fickler Herschel & Mathes
One South Broad Street, Suite 1500
Philadelphia, Pennsylvania 19107

EUGENE A. SCHOON, ESQUIRE
Sidley Austin
One South Dearborn Street
Chicago, Illinois 60603
Attorneys for Appellee,

Voicestream Wireless Corporation
n/k/a T-Mobile USA, Inc.

EDWARD M. CRANE, ESQUIRE
Skadden Arps Slate Meagher & Flom
155 North Wacker Drive
Chicago, Illinois 60606

STEVEN A. HABER, ESQUIRE
Obermayer Rebmann Maxwell & Hippel
One Penn Center, 19th Floor
1617 John F. Kennedy Boulevard
Philadelphia, Pennsylvania 19103
     Attorneys for Appellees,
     Nextel Communications of the Mid-Atlantic, Inc.;
     Nextel Boost of the Mid-Atlantic LLC; Nextel West
     Corp.; Nextel Boost West LLC

JAMES P. ULWICK, ESQUIRE
Kramon & Graham
Commerce Place, Suite 2600
One South Street
Baltimore, Maryland 21202
     Attorney for Appellee,
     NEC Corporation of America

FRANCIS A. CITERA, ESQUIRE
Greenberg Traurig

77 West Wacker Drive, Suite 2500
Chicago, Illinois 60601

BRIAN T. FEENEY, ESQUIRE
Greenberg Traurig
2700 Two Commerce Square
2001 Market Street
Philadelphia, Pennsylvania 19103

FRANCINE F. GRIESING, ESQUIRE
Griesing Law
1717 Arch Street, Suite 360
Philadelphia, Pennsylvania 19103
　　　Attorneys for Appellees,
　　　Qualcomm, Inc.;
　　　Sony Electronics, Inc.

HOWARD D. SCHER, ESQUIRE
Buchanan Ingersoll & Rooney
Two Liberty Place, Suite 3200
50 South 16th Street
Philadelphia, Pennsylvania 19102
　　　Attorney for Appellee,
　　　Cellular One Group

WALTER H. SWAYZE, III, ESQUIRE
Segal McCambridge Singer & Mahoney
United Plaza, Suite 1700

30 South 17th Street
Philadelphia, Pennsylvania 19103
       Attorney for Appellee,
       Panasonic Corp. of North America f/k/a
       Matsushita Electric Corporation of America

DAVID G.C. ARNOLD, ESQUIRE
915 Montgomery Avenue, Suite 109
Narberth, Pennsylvania 19072

LINDA B. EPSTEIN, ESQUIRE
Hughes Hubbard & Reed
1775 I Street, N.W., Suite 600
Washington, D.C. 20006
       Attorneys for Appellee,
       LG Electronics Mobilecomm U.S.A., Inc.

ROCHELLE M. FEDULLO, ESQUIRE
Wilson Elser Moskowitz Edelman & Dicker
The Curtis Center, Suite 1130 East
Independence Square West
601 Walnut Street
Philadelphia, Pennsylvania 19106
       Attorney for Appellee,
       Sanyo North America, Inc.

ASHLEY R. ADAMS, ESQUIRE
Akin Gump Strauss Hauer & Feld

1111 Louisiana Street, 44th Floor
Houston, Texas 77002

FRED I. WILLIAMS, ESQUIRE
Akin Gump Strauss Hauer & Feld
300 West Sixth Street, Suite 2100
Austin, Texas 78701

STEVEN M. ZAGER, ESQUIRE
Akin Gump Strauss Hauer & Feld
One Bryant Park
New York, New York 10036
    Attorneys for Appellee,
    Nokia, Inc.

WALTER L. McDONOUGH, ESQUIRE
Swartz Campbell
Two Liberty Place, 28th Floor
50 South 16th Street
Philadelphia, Pennsylvania 19102
    Attorney for Appellee,
    Sprint Corp.

STEPHAN G. WEIL, ESQUIRE
Dickstein Shapiro
1825 Eye Street, N.W.
Washington, D.C. 20006

CRAIG E. ZIEGLER, ESQUIRE
Montgomery McCracken Walker & Rhoads
123 South Broad Street, 24th Floor
Philadelphia, Pennsylvania 19109
        Attorneys for Appellee,
        Audiovox Communications Corporation

MARK A. ARONCHICK, ESQUIRE
ROBERT L. EBBY, ESQUIRE
Hangley Aronchick Segal & Pudlin
One Logan Square, 27th Floor
18th & Cherry Streets
Philadelphia, Pennsylvania 19103

CHARLES L. BABCOCK, ESQUIRE
DAVID T. MORAN, ESQUIRE
Jackson Walker
901 Main Street, Suite 6000
Dallas, Texas 75202
        Attorneys for Appellee,
        Ericsson Inc.

RAYMOND B. BIAGINI, ESQUIRE
LISA M. NORRETT, ESQUIRE
McKenna Long & Aldridge
1900 K Street, N.W.
Washington, D.C. 20006

MARY C. DOHERTY, ESQUIRE
Marshall Dennehey Warner Coleman & Goggin
1845 Walnut Street, 21st Floor
Philadelphia, Pennsylvania 19103
Attorneys for Appellee,
Philips Electronics North America Corporation

ROBERT E. WELSH, JR., ESQUIRE
Welsh & Recker
2000 Market Street, Suite 2903
Philadelphia, Pennsylvania 19103
Attorney for Appellee,
Cellular Telecommunication Industry Association

TERRENCE J. DEE, ESQUIRE
MICHAEL B. SLADE, ESQUIRE
Kirkland & Ellis
300 North LaSalle Street, Suite 2400
Chicago, Illinois 60654
Attorneys for Appellee,
Motorola Inc.

JAMES M. MESNARD, ESQUIRE
Seyfarth Shaw
975 F Street, N.W.
Washington, D.C. 20004
Attorney for Appellee,
Telecommunications Industry Association

11

---

OPINION OF THE COURT

---

SCIRICA, *Circuit Judge*.

Appellant Francis J. Farina brought this class action against various cell phone manufacturers and retailers of wireless handheld telephones. He appeals from the dismissal of his complaint on the ground that his claims are preempted by regulations promulgated by the Federal Communications Commission. We will affirm.

I.

Farina represents a putative class consisting of all past, current, and future Pennsylvania purchasers and lessees of cell phones who have not been diagnosed with an injury or illness resulting from their cell phone usage. Farina's claims are based on the allegation that cell phones, as currently manufactured, are unsafe to be operated without headsets because the customary manner in which they are used—with the user holding the phone so that the antenna is positioned next to his head—exposes the user to dangerous amounts of radio frequency ("RF") radiation. Farina alleges the marketing of cell phones as safe for use without headsets violates several provisions of Pennsylvania law.

A.

A cell phone functions by transmitting information between its low-powered radio transmitter and a base station, usually a tower containing a large antenna. *See generally Pinney v. Nokia, Inc.*, 402 F.3d 430, 439–40 (4th Cir. 2005). Each base station reaches a relatively small area, or cell, and as a user moves from cell to cell, the signal must transfer from base station to base station. *Id.* at 440. When cell phones communicate with base stations, they emit RF energy. *Id.* The strength of a cell phone signal, and hence its range, has been positively correlated with the intensity of its RF emissions. *See In re Rural Telephone Cos.*, 18 F.C.C.R. 20802, 20829 & n.114 (2003) [hereinafter *NPR Rural*] (notice of proposed rulemaking).[1]

---

[1]The power level of a cell phone, measured in watts, is correlated with the range of a cell phone signal. *See NPR Rural*, 18 F.C.C.R. at 20829 ("One way to increase the range of radio systems is by increasing power levels."); *id.* at 20830 ("[R]eceived signal levels decrease exponentially as the receiver moves farther from the transmitter . . . ."). The intensity of RF radiation is measured in watts per kilogram. *See* 47 C.F.R. § 2.1093(d). Thus, the intensity of RF radiation is correlated with the power level and, therefore, range. *See generally* FCC, Office of Engineering & Technology, Questions and Answers about Biological Effects and Potential Hazards of Radiofrequency Electromagnetic Fields, OET Bull. No. 56, 5–6

The science is clear that at high levels RF radiation can cause adverse "thermal" effects resulting from the heating of human tissue. *See generally* FCC, Office of Engineering & Technology, Questions and Answers about Biological Effects and Potential Hazards of Radiofrequency Electromagnetic Fields, OET Bull. No. 56, 6–7 (4th ed. Aug. 1999) [hereinafter O E T   B u l l e t i n ] ,   *a v a i l a b l e   a t* http://www.fcc.gov/Bureaus/Engineering_Technology/Docum ents/bulletins/oet56/oet56e4.pdf.   More controversial is the purported existence of "non-thermal" effects caused by lower levels of RF radiation.  Farina alleges that over the past five decades "dozens of peer reviewed research papers were published which, individually and collectively, raised serious and credible questions regarding whether the RF[ radiation] to which [cell phone] users were and are exposed posed a risk or threat to their health."  Third Am. Compl. ¶ 51; *see also id.* ¶¶ 79–86, 90–98 (describing findings from numerous studies and laboratory tests).  According to the FCC, however, "the evidence for production of harmful biological effects [from low-level RF radiation] is ambiguous and unproven."   OET Bulletin 8. Results from studies have been "inconclusive," and "while the possibility of 'non-thermal' biological effects may exist, whether or not such effects might indicate a human health hazard is not presently known." *Id.*  In light of the present state

---

(4th   ed.   Aug.   1999),   *a v a i l a b l e   a t* http://www.fcc.gov/Bureaus/Engineering_Technology/Docum ents/bulletins/oet56/oet56e4.pdf.

of the science, the FCC has stated that any cell phone legally sold in the United States is a "safe" phone. App. 691.

## B.

Federal regulation of radio communications can be traced back a century, to the Wireless Ship Act of 1910, ch. 379, 36 Stat. 629. *See Nat'l Broad. Co. v. United States*, 319 U.S. 190, 210 (1943). Federal control over the medium was extended by the Radio-Communications Act of 1912, ch. 287, 37 Stat. 302, which mandated federal licensing of the use of radio frequencies, *Nat'l Broad. Co.*, 319 U.S. at 210, and was cemented by the Federal Communications Act of 1934, ch. 652, 48 Stat. 1064 ("FCA"), *Nat'l Broad. Co.*, 319 U.S. at 213–14. The FCA was enacted "[f]or the purpose of regulating interstate and foreign commerce in communication by wire and radio so as to make available . . . a rapid, efficient, Nation-wide, and world-wide wire and radio communication service with adequate facilities at reasonable charges . . . ." 47 U.S.C. § 151. To that end, the FCA established the FCC, which was endowed with broad authority to license and regulate radio communications. *See Nat'l Broad. Co.*, 319 U.S. at 214–16.

The FCC's jurisdiction extends to wireless telephone service, *see In re An Inquiry Into the Use of the Bands 825–845 MHz and 870–890 MHz for Cellular Communications Systems*, 86 F.C.C.2d 469, 470 (1981) [hereinafter *Cellular Commc'ns*], and FCC authority over the technical aspects of radio communications is "exclusive," *Head v. N.M. Bd. of Exam'rs in*

15

*Optometry*, 374 U.S. 424, 430 n.6 (1963). The FCC is charged with fostering the development of an efficient wireless network, 47 U.S.C. § 151, and an essential characteristic of an efficient network is nationwide accessibility and compatibility, *see Cellular Commc'ns*, 86 F.C.C.2d at 503 ("Throughout the cellular proceeding an essential objective has been for cellular service to be designed to achieve nationwide compatibility. . . . [A] cellular subscriber traveling outside of his or her local service area should be able to communicate over a cellular system in another city."). Moreover, the FCC has long asserted that uniformity in the technical standards governing wireless services is necessary to ensure an efficient nationwide system. *See id.* at 504–05 ("[W]e are asserting federal primacy over the areas of technical standards and competitive market structure for cellular service."); *see also In re Petition of the Conn. Dep't Pub. Util. Control*, 10 F.C.C.R. 7025, 7034 (1995) ("Congress intended . . . to establish a *national* regulatory policy for [commercial mobile radio services], not a policy that is balkanized state-by-state." (footnote omitted)).

The FCC has regulated human exposure to RF emissions only since 1985. *See In re Responsibility of the F.C.C. to Consider Biological Effects of Radiofrequency Radiation*, 100 F.C.C.2d 543, 544 (1985) [hereinafter *Responsibility*]. The FCC's RF regulations were promulgated to satisfy the Commission's obligations under the National Environmental

16

Policy Act of 1969 ("NEPA"), 42 U.S.C. §§ 4321 *et seq.*[2] NEPA obligates all federal agencies—not just the FCC—to consider and identify the environmental impact of any "major" action that "significantly affect[s] the quality of the human environment." 42 U.S.C. § 4332(2)(C). Although the FCC does not possess individual agency expertise with respect to the development of public health and safety standards, *see Responsibility*, 100 F.C.C.2d at 551, the Commission concluded that NEPA obligated it to regulate RF radiation, see *id.* at 546. After seeking input from other federal agencies[3] and interested parties, the FCC adopted as its own standard the then-current American National Standards Institute Committee ("ANSI") standard governing RF emissions. *Id.* at 551. Notably, these regulations did not extend to cell phones. See *id.* at 561–62.

---

[2]Although RF standards were issued to satisfy NEPA obligations, the regulations were promulgated pursuant to the FCC's rulemaking authority under, inter alia, 47 U.S.C. §§ 154(i) and 303(r).

[3]In particular, the FCC has solicited guidance on its RF regulations from the Food and Drug Administration, the Environmental Protection Agency, the Occupational Safety and Health Administration, the National Institute for Occupational Safety and Health, the National Telecommunications and Information Administration, and the Department of Defense. *See* OET Bulletin 27.

In 1993, prompted by ANSI's revision of its standards in collaboration with the Institute of Electrical and Electronic Engineers, Inc. ("IEEE"), the FCC began rulemaking procedures to determine whether it should strengthen its regulations. *See In re Guidelines for Evaluating the Environmental Effects of Radiofrequency Radiation*, 8 F.C.C.R. 2849, 2849 (1993) [hereinafter *NPR FCC First Order*] (notice of proposed rulemaking). Among the proposed changes was the extension of RF regulations to cover cell phones. *Id.* at 2851. During the pendency of this notice-and-comment period, Congress passed the Telecommunications Act of 1996 ("TCA"), which directed the FCC to "make effective rules regarding the environmental effects of [RF] emissions" within 180 days of the TCA's enactment. Pub. L. No. 104-104, § 704(b), 110 Stat. 56, 152. In addition, the TCA expanded the FCC's authority to preempt certain state and local regulations of RF emissions. *See* 47 U.S.C. § 332(c).

In response to the TCA, the FCC adopted a hybrid of the ANSI/IEEE standard and the standard recommended by the National Council on Radiation Protection and Measurements ("NCRP"). *See In re Guidelines for Evaluating the Environmental Effects of Radiofrequency Radiation*, 11 F.C.C.R. 15123, 15134–35, 15146–47 (1996) [hereinafter *FCC First Order*]. These regulations, reflecting a "consensus view of the federal agencies responsible for matters relating to the public safety and health," *id.* at 15124, limited RF emissions from cell phones for the first time, *id.* at 15146–47. In

18

particular, the FCC adopted a maximum specific absorption rate ("SAR")—which measures the amount of energy absorbed in human tissue—in "uncontrolled"[4] environments of 0.08 watts/kilogram (W/kg) as averaged over the whole-body and 1.6 W/kg spatial peak as averaged over any 1 gram of tissue, as measured for frequencies between 100 kHz and 6 GHz. *Id.* at 15140–41, 15146–47; *see also* 47 C.F.R. § 2.1093(d)(2).[5] The Commission recognized that research on the safety of RF radiation was ongoing, and pledged to monitor the science "in order to ensure that our guidelines continue to be appropriate

---

[4]The ANSI/IEEE and NCRP standards drew distinctions between exposure in "occupational"/"controlled" environments and exposure in "general population"/"uncontrolled" environments, which were subsequently adopted by the FCC. *Id.* at 15139. The occupational/controlled exposure standard applies to individuals exposed as a result of their employment, who are fully aware of possible exposure, and can exercise control over it. *Id.* The general population/uncontrolled exposure standard applies to the general public or those individuals exposed as a result of their employment who are either unaware of exposure or cannot exercise control over it. *Id.*

[5]The SAR maximum for general population/uncontrolled exposure contains exemptions for exposure to the hands, wrists, feet, and ankles, at which the spatial peak SAR is 4 W/kg, as averaged over any 10 grams of tissue. 47 C.F.R. § 2.1093(d)(2).

19

and scientifically valid." *FCC First Order*, 11 F.C.C.R. at 15125. The FCC reaffirmed the standards relevant to this case one year later. *See In re Procedures for Reviewing Requests for Relief From State and Local Regulations*, 12 F.C.C.R. 13494, 13505 (1997) [hereinafter *FCC Second Order*]. The current standards are codified at 47 C.F.R. § 2.1093(d), and all cell phones sold in the United States must comply with those regulations, 47 C.F.R. §§ 2.803(a)(1), 24.51–.52.

## C.

The complaint before us in this appeal is Farina's Third Amended Complaint. The procedural history of this case is complex, winding through state court, two federal district courts, and the Judicial Panel on Multidistrict Litigation. Because the specifics of the procedural history are implicated by Farina's challenge to our subject matter jurisdiction, we set them out in detail.

Farina initially brought this putative class action in the Philadelphia County Court of Common Pleas, asserting claims for: (1) civil conspiracy to market and sell defective cell phones by collective means, including the suppression of information regarding the health risks of RF emissions and the deliberate misleading of the public as to those risks; (2) breach of implied warranties of merchantability and fitness for a particular purpose, on the ground that cell phones sold without headsets were unsafe to use; (3) breach of express warranty of safe usage; (4) violation of the Magnuson-Moss Warranty Improvement

Act, 15 U.S.C. §§ 2301–12, on the basis of breach of express and implied warranties; (5) violation of the Pennsylvania Unfair Trade Practices and Consumer Protection Law;[6] and (6) a judgment under the Pennsylvania Declaratory Judgments Act, 42 Pa. Cons. Stat. § 7531, *et seq*., declaring that defendants' conduct violated Pennsylvania law and requiring defendants to award the class members with headsets.

Farina filed his initial complaint on April 19, 2001. Defendants subsequently removed the case to the United States District Court for the Eastern District of Pennsylvania. Farina's case was one of a set of parallel cases alleging defects in cell phones arising from the health risks of RF radiation that were brought in state courts in Pennsylvania, Maryland, New York, Georgia, and Louisiana. The cases were consolidated[7] by the Judicial Panel on Multidistrict Litigation and transferred to the United States District Court for the District of Maryland ("Maryland court"). *In re Wireless Tel. Radio Frequency*

---

[6] Farina has since voluntarily dismissed this claim, on the basis of our holding in *Hunt v. U.S. Tobacco Co.*, 538 F.3d 217 (3d Cir. 2008).

[7] The Georgia case, *Gimpelson v. Nokia, Inc.*, was pending at the time of the initial consolidation, *see In re Wireless Tel. Radio Frequency Emissions Prods. Liab. Litig.*, 170 F. Supp. 2d 1356, 1357 n.2 (J.P.M.L. 2001), but was subsequently consolidated as a tag-along action.

*Emissions Prods. Liab. Litig.*, 170 F. Supp. 2d 1356, 1358 (J.P.M.L. 2001). Four of these cases, including Farina's, were removed to federal court on the basis of federal-question jurisdiction. The Louisiana case, *Naquin v. Nokia Mobile Phones, Inc.*, was removed on the basis of diversity jurisdiction. The plaintiffs in all cases, except for the *Naquin* plaintiffs, filed a consolidated motion to remand before the Maryland court. The court denied the motion, concluding that federal-question jurisdiction was raised by the issue of federal preemption. *In re Wireless Tel. Radio Frequency Emissions Prods. Liab. Litig.*, 216 F. Supp. 2d 474, 491–92 (D. Md. 2002). The court then granted the defendants' motion to dismiss, concluding that FCC regulations of RF emissions preempted the plaintiffs' suit. *In re Wireless Tel. Radio Frequency Emissions Prods. Liab. Litig.*, 248 F. Supp. 2d 452, 467 (D. Md. 2003).

The plaintiffs appealed to the Court of Appeals for the Fourth Circuit, which reversed. *Pinney*, 402 F.3d at 439. The court found subject matter jurisdiction lacking for the plaintiffs—including Farina—in the cases other than *Naquin*. *Id.* at 451. In particular, the issue of federal preemption did not arise on the face of a "well-pleaded complaint," but merely constituted an anticipated affirmative defense, which could not confer jurisdiction. *Id.* at 445–46. It similarly rejected application of the jurisdictional doctrine of complete preemption. *Id.* at 451. However, for the *Naquin* plaintiffs, the court reached the merits of the preemption issue—as it had jurisdiction on the basis of diversity—and concluded the FCA,

as amended by the TCA, did not preempt these claims. *Id.* at 459.

Accordingly, because the Fourth Circuit concluded federal jurisdiction did not exist over Farina's claims, his case was remanded back to the Court of Common Pleas. On December 23, 2005, Farina filed a Second Amended Complaint, adding, for the first time, LG Electronics, Inc., a Korean cell phone manufacturer, and its American subsidiary, LG Electronics U.S.A., Inc. (collectively, "LG defendants"). The complaint was served on December 27, and no defendant sought removal within thirty days, as required by 28 U.S.C. § 1446(b).

Shortly after the filing of the Second Amended Complaint, LG defendants' counsel allegedly approached Farina's counsel, seeking to drop the listed LG corporations from the suit—who purportedly had no connection to the manufacture or retail of cell phones—and substitute a different American subsidiary, LG Electronics MobileComm U.S.A., Inc. ("LG MobileComm"). According to Farina, his counsel hesitated to amend the complaint, as it had filed the Second Amended Complaint only three weeks prior, and sought instead to file a Praecipe to Amend Caption and Substitute Party. But, as Farina alleges, LG defendants' counsel insisted upon a formal amended complaint,[8] and Farina acquiesced, filing the Third

---

[8]This insistence was ostensibly due to Pa. R. Civ. P. 1714, which requires court approval for the discontinuation of any class action.

23

Amended Complaint on February 9, 2006. The Third Amended Complaint was identical to the Second Amended Complaint in all material respects, with the exception of the replacement of LG defendants with LG MobileComm.

Although LG defendants had not removed the case within thirty days of the date they were added to the Second Amended Complaint, LG MobileComm removed the action on February 17, 2006—well within 30 days of the filing of the Third Amended Complaint—asserting jurisdiction existed under the Class Action Fairness Act, 28 U.S.C. § 1332(d). Defendants then sought to stay the proceedings pending a transfer to the Judicial Panel on Multidistrict Litigation, which the District Court granted on March 22. The case returned to the Judicial Panel on Multidistrict Litigation, which transferred the case back to the Maryland court on June 20.[9] Farina had filed a Motion to Vacate Conditional Transfer Order prior to the transfer to the Maryland court, based primarily on the absence of federal subject matter jurisdiction. The Judicial Panel on Multidistrict Litigation did not address the jurisdictional issue in its transfer order, stating "[t]he pending motion to remand to state court can be presented to and decided by the transferee judge." App. 331. On November 10, Farina filed an Amended

---

[9]The District Court listed the date of the transfer as June 26. According to the docket, the transfer order appears to have been issued on June 20.

24

Motion to Remand before the Maryland court.[10]  After a hearing on the motion to remand to state court, the Maryland court made no decision on the issue, instead transferring the case back to the Eastern District of Pennsylvania.

The District Court ultimately denied Farina's motion. The court held CAFA provided grounds for federal jurisdiction, and Farina's failure to move to remand within thirty days of LG MobileComm's removal waived the defects in defendants' initial failure to remove within the required thirty-day period after the filing of the Second Amended Complaint.  In a separate order, the District Court addressed the merits of the preemption issue, concluding that the FCC's regulations governing RF emissions preempted Farina's claims.  Farina timely appealed.

II.

"[E]very federal appellate court has a special obligation to 'satisfy itself not only of its own jurisdiction, but also that of

---

[10]As the District Court recognized, there is some disagreement as to when the motion for remand was filed. Defendants argued below that the November 10 motion constituted the initial motion for remand.  Farina, on the other hand, contended this motion was merely an amended motion for remand, and that the initial motion was included in the motion to vacate the transfer order, which was docketed on April 12. As discussed below, the difference between these dates is immaterial.

the lower courts in a cause under review . . . .'" *Bender v. Williamsport Area Sch. Dist.*, 475 U.S. 534, 541 (1986) (quoting *Mitchell v. Maurer*, 293 US. 237, 244 (1934))). We review a district court's determination of its own subject matter jurisdiction de novo. *Emerald Investors Trust v. Gaunt Parsippany Partners*, 492 F.3d 192, 197 (3d Cir. 2007).

A.

There is no dispute that this case, in its current incarnation, satisfies the substantive requirements of CAFA.[11] *See* Def. LG MobileComm's Notice of Removal 6–9. But CAFA is not retroactively applicable. It applies only to civil actions "commenced on or after the date of enactment," February 18, 2005. CAFA, Pub. L. No. 109-2, § 9, 119 Stat. 4, 14 (2005) (codified as Note to 28 U.S.C. § 1332).

CAFA itself provides no definition of commencement. We have not yet addressed the issue, but most of our sister circuits have looked to state law for the definition of commencement. *See Braud v. Transp. Serv. Co. of Ill.*, 445 F.3d 801, 803 (5th Cir. 2006) ("[T]he courts of appeals that have examined the issue have unanimously held that when a lawsuit

[11]CAFA grants federal jurisdiction over class actions in which the aggregate amount in controversy exceeds $5,000,000, the parties are minimally diverse, and the members of all proposed plaintiff classes are equal to or greater than 100 in number. 28 U.S.C. § 1332(d).

26

is initially 'commenced' for purposes of CAFA is determined by state law. We agree." (footnote omitted)); *Schorsch v. Hewlett-Packard Co.*, 417 F.3d 748, 750 (7th Cir. 2005) ("[S]tate rather than federal practice must supply the rule of decision."); *see also Smith v. Nationwide Prop. and Cas. Ins. Co.*, 505 F.3d 401, 405 (6th Cir. 2007); *Plubell v. Merck & Co.*, 434 F.3d 1070, 1071 (8th Cir. 2006); *Bush v. Cheaptickets, Inc.*, 425 F.3d 683, 686 (9th Cir. 2005); *Natale v. Pfizer, Inc.*, 424 F.3d 43, 44 (1st Cir. 2005). *But see Prime Care of Ne. Kan., LLC v. Humana Ins. Co.*, 447 F.3d 1284, 1289 n.6 (10th Cir. 2006) ("[W]e do not express an opinion as to whether federal or state law should control.").

We agree that state law should govern the inquiry. CAFA operates as an expansion of diversity jurisdiction. *See Bush*, 425 F.3d at 686. The Act expressly authorizes the removal of qualifying class actions to federal court. *See* Pub. L. No. 109-2, § 5, 119 Stat. 4, 12–13 (codified at 28 U.S.C. § 1453). It envisions and applies to cases that are initially filed in state court and subsequently removed to federal court. For a case initially brought in state court, state law should govern when the case commences. *Cf. Ragan v. Merchs. Transfer & Warehouse Co.*, 337 U.S. 530, 533–34 (1949) (applying state law to determine commencement for statute of limitations purposes); *Herb v. Pitcairn*, 324 U.S. 117, 120 (1945) ("Whether any case is pending in the Illinois courts is a question to be determined by Illinois law . . . ."). Accordingly, we look to Pennsylvania law.

27

The filing of an original complaint in Pennsylvania court commences an action. *See* Pa. R. Civ. P. 1007 ("An action may be commenced by filing with the prothonotary (1) a praecipe for a writ of summons, or (2) a complaint."). As such, the filing of the original complaint commenced a civil action for the purposes of CAFA. Farina's initial complaint was filed on April 19, 2001, clearly before CAFA's enactment. But the Second Amended Complaint, filed on December 23, 2005, and the Third Amended Complaint, filed on February 9, 2006, were filed after the date of CAFA's enactment. If either of these complaints constituted the commencement of a new action, CAFA's jurisdictional grant would apply. The issue before us, then, is whether the amendment of the original complaint in the Second Amended Complaint or the Third Amended Complaint commenced a new case.

The case law has coalesced around three approaches to the effect of amendments to complaints on CAFA commencement. The first approach, adopted by the Court of Appeals for the Ninth Circuit, ignores amendments and looks only to the filing of the original complaint for commencement. *McAtee v. Capital One, F.S.B.*, 479 F.3d 1143, 1147–48 (9th Cir. 2007) (interpreting California law to hold that an action "is commenced for purposes of CAFA when a complaint is filed, irrespective of any later amendment of that complaint. . . . Any amendment of that complaint—whether to add new causes of action, to add or replace plaintiffs, or to add or replace

28

defendants—does not change the commencement date").[12]

The other two approaches both apply state-law principles governing the relation-back of pleadings for statutes of limitations to determine whether an amended complaint is distinct enough from the original complaint to commence a new case. *See Prime Care*, 447 F.3d at 1286. One approach, adopted by the Courts of Appeals for the Sixth, Eighth, and Tenth Circuits, applies ordinary relation-back rules to all amendments, no matter what type of amendment is made (the "*Prime Care* approach"). *See id.*; *see also Smith*, 505 F.3d at 405; *Plubell*, 434 F.3d at 1071. If the amendment would not relate back to the pre-CAFA pleading, it constitutes a commencement of a new case. *Prime Care*, 447 F.3d at 1286. The final approach uses relation-back rules as well, but categorically treats certain changes as commencing a new case (the "*Braud* approach"). *See Braud*, 445 F.3d at 804–05;

---

[12]Although *McAtee* is limited to CAFA cases filed in California, *id.* at 1147, much of its discussion suggests this rule has broader applicability than just to California law. The Ninth Circuit argued that relation-back principles need not be used in CAFA commencement because the substantive rights of parties are not implicated, as they would be for a statute of limitations. *Id.* Rather, CAFA commencement affects only the forum in which the suit takes place. *Id.* These arguments are not limited to an interpretation of California law, but would seemingly be applicable to any state relation-back rules.

29

*Knudsen v. Liberty Mut. Ins. Co.*, 411 F.3d 805, 807 (7th Cir. 2005).  In particular, the addition of a new defendant—unless the addition is done merely to correct a clerical error, *see Schillinger v. Union Pac. R.R. Co.*, 425 F.3d 330, 333 (7th Cir. 2005)—or the addition of a distinct claim, *see Schorsch*, 417 F.3d at 749, commences a new civil action.

We agree with the general approach of applying relation-back rules to at least some amendments.  In doing so, we reject the approach of the Ninth Circuit in *McAtee*.  As the Tenth Circuit recognized:

> [T]he unqualified disregard of any post-CAFA pleading amendments . . . entails the practically untenable result that once a pre-CAFA case is filed, the plaintiff can tack on new causes of action so substantively independent of the original case that they would be properly treated as filed after CAFA's effective date for all legal purposes . . . *except for CAFA*.

*Prime Care*, 447 F.3d at 1288 n.4.  "Generally 'a party brought into court by an amendment, and who has, for the first time, an opportunity to make defense to the action, has a right to treat the proceeding, as to him, as commenced by the process which brings him into court.'" *Braud*, 445 F.3d at 805 (quoting *United States v. Martinez*, 195 U.S. 469, 473 (1904)).  "It 'would be a novel and unjust principle to make the defendants responsible for a proceeding of which they had no notice.'"  *Id.* (quoting

30

*Miller v. M'Intyre*, 31 U.S. (6 Pet.) 61, 64 (1832)).

Moreover, although CAFA does not define commencement, "Congress is presumed to enact legislation with knowledge of the law and a newly-enacted statute is presumed to be harmonious with existing law and judicial concepts." *Prime Care*, 447 F.3d at 1287 (internal quotation marks omitted). Congress passed CAFA aware of the general principles of relation-back analysis, both under state law and Fed. R. Civ. P. 15(c). It is only natural that Congress would intend to incorporate into CAFA the case law governing amended pleadings. "Precisely because CAFA does not define 'commencement' of an action, it is obvious that CAFA is not intended to replace caselaw deciding when a lawsuit is considered 'commenced . . . .'" *Braud*, 445 F.3d at 805.

But because the result is the same under either the *Prime Care* approach or the *Braud* approach, we need not choose between the two.[13] Under Pennsylvania law,[14] a party "may at

[13]In fact, it is unclear how distinct these approaches are. Both the Courts of Appeals for the Fifth and the Seventh Circuits—which follow the *Braud* approach—recognize an exception to the categorical rule that an amendment adding a new defendant commences a new civil action when that addition is merely to correct a clerical misidentification of a party. *See Braud*, 445 F.3d at 806–07; *Schillinger*, 425 F.3d at 333. In dicta, *Braud* explained this "misnomer" exception by looking to both Louisiana law as well as Rule 15(c)(3), governing when an

31

amendment adding a defendant will relate back to the prior pleading. 445 F.3d at 806–08. If the "misnomer" exception applies every time the addition of a defendant would relate back under ordinary relation-back analysis, the two approaches are coextensive.

[14]Because state law governs the definition of commencement, state law should also govern the relation-back of amendments. In *Braud*, the Fifth Circuit used state law to define commencement, 445 F.3d at 803–04, but did not specify whether state or federal relation-back rules would apply to amendments, *id.* at 807 n.14 ("It is less certain whether state law provides the applicable rules for the relation back analysis. . . . The result in this case is the same under either . . . ."). But commencement is not alien to the relation-back analysis. *See Prime Care*, 447 F.3d at 1288 ("Nor . . . are commencement and amendment properly seen as utterly unrelated matters. Rather, the relevant landscape in which both of these legal concepts reside has for some time been governed by the relation-back principle." (footnote omitted)). Moreover, in these cases, state law provides the applicable statute of limitations, *see Ragan*, 337 U.S. at 533–34, and Rule 15(c)(1)(A) expressly co-opts the relation-back rules of "the law that provides the applicable statute of limitations," Fed. R. Civ. P. 15(c)(1)(A). An amendment that does not relate back constitutes a commencement under CAFA. Accordingly, if state law defines the commencement of the initial civil action, it naturally should

32

any time change the form of action, correct the name of a party or amend his pleading." Pa. R. Civ. P. 1033. But a party may not add a "new and distinct" party after the statute of limitations has run. *Tork-Hiis v. Commonwealth.*, 735 A.2d 1256, 1258 (Pa. 1999). In other words, if an added defendant is "new and distinct" from the defendants named in the prior pleading, the amendment will not relate back. The only exceptions to this general rule apply where the assets subject to the risk of liability would not change or where the amendment is made only to correct the improper designation of a business entity. *Id.*

Under this standard, the Second Amended Complaint commenced a new action. In a hearing before the District Court, Farina's counsel conceded that LG defendants were not a party to the case prior to the Second Amended Complaint. App. 462. Because they were unrelated to any of the named defendants, the addition of LG defendants placed new assets at risk of liability and went beyond merely correcting an improper designation of a business entity. Accordingly, they constituted "new and distinct" parties. Because the Second Amended Complaint was filed after the enactment of CAFA, Farina's claims became subject to its provisions.

Farina raises several arguments counseling against recognizing the Third Amended Complaint as the

---

provide the rules governing commencement via amendment—in other words, the rules governing relation back.

33

commencement of a new action.[15]  Even assuming we were persuaded by these arguments, they would only establish that the Third Amended Complaint would relate back to the filing of the Second Amended Complaint.  They would not establish that the Second Amended Complaint would relate back to the filing of the original complaint.  Because the Second Amended Complaint was filed after the enactment of CAFA, CAFA applies and confers federal jurisdiction.

## B.

Farina also argues that even if the Second Amended Complaint would have established federal jurisdiction under CAFA, the District Court lacked jurisdiction here because the removal by LG MobileComm was untimely.[16]  CAFA has its own removal statute, 28 U.S.C. § 1453, which, for all pertinent purposes, imports the procedures of the general removal statute,

---

[15]In particular, Farina argues the substitution of LG MobileComm for LG defendants was merely a correction of an improper designation of a business entity and that this substitution occurred at the insistence of LG defendants.

[16]Under CAFA, any defendant may remove the entire case—not just the claims asserted against that particular defendant—without the consent of any other defendant.  28 U.S.C. § 1453(b); *Brown v. Jevic*, 575 F.3d 322, 327 (3d Cir. 2009). If LG MobileComm properly removed the claims against it, the removal of the entire class action was valid.

28 U.S.C. § 1446. Section 1446(b) requires a defendant to file for removal within thirty days of receiving a copy of the pleading setting forth the removable claim.[17]

If the substitution of LG MobileComm for LG defendants in the Third Amended Complaint commenced a new case under CAFA, there is no dispute that removal was timely. The Third Amended Complaint was filed on February 9, 2006,[18] and LG MobileComm filed its notice of removal on February 17—well within thirty days. But Farina argues the Third Amended Complaint relates back to the Second Amended Complaint, *see supra* note 15, and, therefore, does not constitute a commencement. The § 1446(b) time limit would then run from the date of the filing of the Second Amended Complaint, December 23, 2005, and the notice of removal would be

---

[17]If the claim is not initially removable, the thirty-day period runs from the date of receipt of "a copy of the amended pleading, motion, order or other paper from which it may first be ascertained that the case is one which is or has become removable." *Id.*

[18]Defendants state that LG MobileComm was served with the Third Amended Complaint on January 20, 2006, but the record indicates the Third Amended Complaint was dated January 27, App. 213, and docketed on February 9, App. 306. The difference between these dates is immaterial, however, as LG MobileComm's removal was timely under any of these dates.

untimely.

We need not decide whether the Third Amended Complaint relates back to the Second Amended Complaint because even if the Second Amended Complaint is the relevant date and LG MobileComm's removal was therefore untimely, Farina waived his objection. 28 U.S.C. § 1447 provides the procedures generally applicable after removal and is explicitly adopted by CAFA, *see* 28 U.S.C. § 1453(c)(1). Section 1447(c) stipulates that a remand motion made on the basis of "any defect other than lack of subject matter jurisdiction" must be filed within thirty days of the notice of removal. The failure to move to remand results in a waiver of the objection. *See Ariel Land Owners, Inc. v. Dring*, 351 F.3d 611, 613 (3d Cir. 2003). A jurisdictional defect, on the other hand, may be raised at any time. *Id.*

It is well settled that § 1446(b)'s thirty-day time limit for removal is a procedural provision, not a jurisdictional one. *Id.* at 614; *see also McGlinchey v. Hartford Accident & Indem. Co.*, 866 F.2d 651, 653 (3d Cir. 1989) ("[T]he failure to file a removal petition within the 30 day statutory time limit [does not] affect this Court's jurisdiction."); *Albritton Commc'ns Co. v. NLRB*, 766 F.2d 812, 820 (3d Cir. 1985) ("[R]emoval proceedings are in the nature of process, and thus defects in the removal procedures are waivable . . . ."). A defect is considered jurisdictional "only if the case could not initially have been filed in federal court." *Ariel Land Owners*, 351 F.3d at 614 (quoting *Korea Exch. Bank v. Trackwise Sales Corp.*, 66 F.3d 46, 50 (3d

Cir. 1995)). Federal jurisdiction over Farina's suit arose on December 23, 2005, when the Second Amended Complaint commenced a new civil action and brought the case under CAFA. Because at that moment the case could have been filed in federal court, the failure to remove within thirty days of the filing of the Second Amended Complaint was not a jurisdictional defect.

LG MobileComm removed the case on February 17, 2006, and, accordingly, Farina had thirty days—until March 20—to seek a remand to state court on untimeliness grounds. As the District Court recognized, the parties dispute when the motion to remand was filed. Defendants argued below that Farina sought a remand on November 10.[19] Farina claims the remand motion was included with his motion to vacate the Judicial Panel on Multidistrict Litigation's conditional transfer order. But this motion was entered into the docket on April 12, outside of the thirty-day time limit. Farina contends that he waited to file for remand before the Judicial Panel on Multidistrict Litigation because the motion for remand filed after his original complaint was removed in 2001 was not

_____

[19]On appeal, defendants cite October 15 as the date of the filing of the motion for remand. The case before the District Court was stayed at this time, and there is no docket entry in the Maryland court corresponding to this date. We assume this reference is to the November 10 filing, docketed as "Amended Motion to Remand and Memorandum for Remand." App. 89.

37

decided by the District Court prior to the stay of the proceedings pending transfer to the Judicial Panel on Multidistrict Litigation. Instead, it was decided by the transferee Maryland court, and he assumed a similar situation would occur once more. But regardless of Farina's assumption, he failed to file for remand within thirty days of removal. The District Court's stay was issued on March 22, beyond the thirty-day time limit, and could not have had an effect upon the timeliness of Farina's remand motion. The District Court, therefore, "had no authority to remand, because [Farina's] motion was filed more than 30 days after the notice of removal." *Ariel Land Owners*, 351 F.3d at 613.

Accordingly, federal jurisdiction exists over the case whether or not Farina is correct that the Third Amended Complaint relates back to the Second Amended Complaint. The Second Amended Complaint, which added two unrelated defendants, commenced a new civil action, as defined by Pennsylvania law, which brought the case under CAFA's jurisdictional grant. Although the case was not removed within thirty days of the filing of the Second Amended Complaint, Farina's failure to file for remand within thirty days of LG MobileComm's subsequent removal waived his objections to this non-jurisdictional defect. Therefore, our review of defendants' motion to dismiss on the grounds of preemption is

38

proper.[20]

                            III.

The Supremacy Clause of the United States Constitution, U.S. Const. art. VI, cl. 2, invalidates state law that "interferes with or is contrary to federal law." *Free v. Bland*, 369 U.S. 663, 666 (1962) (citing *Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1, 210 (1824)). Federal law can preempt state law in three ways: (1) express preemption, (2) field preemption, and (3) conflict preemption. *Hillsborough Cnty. v. Automated Med. Labs., Inc.*, 471 U.S. 707, 713 (1985). Express preemption applies where Congress, through a statute's express language, declares its intent to displace state law. *Id.* Field preemption applies where "the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject." *Id.* (internal quotation marks omitted). Conflict preemption nullifies state law inasmuch as it conflicts with federal law, either where compliance with both laws is impossible or where state law erects an "obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Id.* (internal quotation marks omitted). Federal regulations preempt state laws in the same fashion as congressional statutes. *Fid. Fed. Sav. & Loan Ass'n v. De la*

---

[20]We have jurisdiction over the appeal under 28 U.S.C. § 1291. We review questions of preemption de novo. *See Deweese v. Nat'l R.R. Passenger Corp.*, 590 F.3d 239, 244 n.8 (3d Cir. 2009).

*Cuesta*, 458 U.S. 141, 153 (1982); *see also Fellner v. Tri-Union Seafoods, L.L.C.*, 539 F.3d 237, 243 (3d Cir. 2008) ("Where Congress has delegated the authority to regulate a particular field to an administrative agency, the agency's regulations issued pursuant to that authority have no less preemptive effect than federal statutes, assuming those regulations are a valid exercise of the agency's delegated authority."). Preemption can apply to all forms of state law, including civil actions based on state law. *See Holk v. Snapple Beverage Corp.*, 575 F.3d 329, 331 (3d Cir. 2009).

In every preemption case, our inquiry is guided by two principles. First, the intent of Congress is the "ultimate touchstone" of preemption analysis. *Medtronic, Inc., v. Lohr*, 518 U.S. 470, 485 (1996) (internal quotation marks omitted). In discerning this intent, we look not only to Congress's express statements, but also to the "structure and purpose of the statute as a whole, as revealed not only in the text, but through the reviewing court's reasoned understanding of the way in which Congress intended the statute and its surrounding regulatory scheme to affect business, consumers, and the law." *Id.* at 486 (citations and internal quotation marks omitted).

Second, we "start[] with the basic assumption that Congress did not intend to displace state law." *Maryland v. Louisiana*, 451 U.S. 725, 746 (1981). "[B]ecause the States are independent sovereigns in our federal system, we have long presumed that Congress does not cavalierly pre-empt state-law causes of action." *Lohr*, 518 U.S. at 485. The Supreme Court

40

has referred to this as a "presumption against preemption." *See Wyeth v. Levine*, 129 S. Ct. 1187, 1195 n.3 (2009). The presumption applies with particular force in fields within the police power of the state, *see Lohr*, 518 U.S. at 485, but does not apply where state regulation has traditionally been absent, *see Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 347 (2001) (rejecting the presumption for state-law fraud claims premised on alleged fraudulent statements made to the FDA because "the relationship between a federal agency and the entity it regulates . . . originates from, is governed by, and terminates according to federal law"); *United States v. Locke*, 529 U.S. 89, 108 (2000) (rejecting the application of the presumption to state regulation of maritime commerce because "Congress has legislated in the field from the earliest days of the Republic," and "in this area there is no beginning assumption that concurrent regulation by the State is a valid exercise of its police powers").

According to defendants, the presumption should not apply to Farina's claims. They argue that federal regulation of radio communications mirrors the regulation of oil tankers at issue in *Locke*. Similar to maritime commerce, radio communications have been within the purview of Congress since the advent of the technology. *See Nat'l Broad. Co.*, 319 U.S. at 210–13 (describing the history of federal regulation of radio communications). The FCC, in particular, has "exclusive" control over the technical aspects of radio communications. *Head*, 374 U.S. at 430 n.6. In addition to this longstanding

41

history of federal authority, defendants contend that radio communications, like the maritime industry, are an instrumentality of commerce. Accordingly, they maintain that traditional state interests underpinning the presumption against preemption are lacking.

But the presence of federal regulation, however longstanding, does not by itself defeat the application of the presumption. Rather, its application "accounts for the historic presence of state law but does not rely on the absence of federal regulation." *Wyeth*, 129 S. Ct. at 1195 n.3; *see also Lohr*, 518 U.S. at 475-77, 485 (applying the presumption despite the decades-long history of federal regulation of public health and safety). While Congress has long exerted control over radio communications, state governments have traditionally regulated the field of public health and welfare. State-law actions based on the risks associated with RF emissions fall squarely within the traditional police power. *See Fellner*, 539 F.3d at 248 ("[I]t is hard to imagine a field more squarely within the realm of traditional state regulation than a state tort-like action seeking damages for an alleged failure to warn consumers of dangers arising from the use of a product.").

Moreover, defendants' characterization of telecommunications as an "instrumentality of commerce" is immaterial. Nothing in the Supreme Court's case law indicates the application of the presumption turns on whether the field regulated can be characterized as an instrumentality of commerce. This language appears to be culled from the

42

jurisprudence governing the Commerce Clause of the United States Constitution, *see United States v. Lopez*, 514 U.S. 549, 558 (1995) ("Congress is empowered to regulate and protect the instrumentalities of interstate commerce . . . ."), and not the doctrine of preemption. Moreover, because the presumption turns on the presence of state law, the ability of Congress to regulate radio communications as an instrumentality of commerce is irrelevant in light of the long history of state regulation of health and safety matters.

Accordingly, we apply the presumption against preemption to our analysis here. But although we conclude the presumption applies, we recognize it is "overcome where a Congressional purpose to preempt or the existence of a conflict is 'clear and manifest.'" *Fellner*, 539 F.3d at 249 (quoting *Hillsborough Cnty.*, 471 U.S. at 715).

A.[21]

---

[21]At the outset, Farina asserts that our preemption analysis is bound by the Fourth Circuit's decision in *Pinney* because its rejection of conflict preemption became law of the case. The law of the case doctrine "posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." *Arizona v. California*, 460 U.S. 605, 618 (1983). The doctrine only applies within the same case—an identical issue decided in a separate action does not qualify as law of the case. *See* 18B Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, Federal

Practice and Procedure § 4478, at 637–39 (2d ed. 2002); *see also Harbor Ins. Co. v. Essman*, 918 F.2d 734, 738 (8th Cir. 1990) (refusing to recognize a denial of a motion to dismiss in a case later dismissed without prejudice as law of the case in a subsequent suit between the same parties).

Farina's contention that *Pinney*'s holding binds us here is misplaced for that reason. The Fourth Circuit made no decision on preemption for the claims brought by Farina. Although Farina's claims were initially consolidated with the other cases, they were subsequently dismissed for lack of subject matter jurisdiction. *Pinney*, 402 F.3d at 451. The decision on conflict preemption, then, was made only with respect to the *Naquin* claims. *Id.* ("We must therefore review the district court's order granting Nokia's motion to dismiss the claims of the Naquin plaintiffs."); *id.* at 459 ("We . . . reverse the district court's order dismissing the Naquin plaintiffs' case as preempted by the FCA."). Without jurisdiction, the Fourth Circuit "had no power" to render a decision on preemption of Farina's claims, *id.*; *see also Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 101–02 (1998) ("For a court to pronounce upon the meaning or the constitutionality of a state or federal law when it has no jurisdiction to do so is, by very definition, for a court to act ultra vires."), and we are not bound by its holding.

Moreover, the Fourth Circuit's rejection of the jurisdictional doctrine of complete preemption, *Pinney*, 402 F.3d at 451, also does not constrain our analysis. Complete

44

Defendants' first argument for dismissal asserts that Farina's claims are expressly preempted by the TCA. As noted, express preemption applies where Congress explicitly states in the language of the statute its intent to preempt state law. *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 516 (1992). But the presence of an express preemption provision does not end the inquiry. While it means we need not inquire whether Congress intended to preempt some state law, we still must examine congressional intent as to the scope of the preemption provision. *See Lohr*, 518 U.S. at 485–86 ("[A]ny understanding of the scope of a pre-emption statute must rest primarily on a fair understanding of congressional purpose." (emphasis and internal quotation marks omitted)). Although we look primarily to the text of an express preemption provision to discern

_____

preemption confers federal jurisdiction over a state claim where Congress "'so completely preempt[s] a particular area that any civil complaint raising th[e] select group of claims is necessarily federal in character.'" *Id.* at 449 (quoting *Metro. Life Ins. Co. v. Taylor*, 481 U.S. 58, 63–64 (1987)) (alterations in the original). Law of the case only extends to issues that were actually decided in prior proceedings. *See* 18B Wright, Miller & Cooper, *supra*, § 4478, at 649. "There is . . . a difference between the doctrine of complete preemption and the affirmative defense of federal preemption." *Pinney*, 402 F.3d at 449. Accordingly, the decision on complete preemption does not constitute an actual decision on the issue of conflict preemption.

45

congressional intent, we also look to the context of the regulatory scheme as a whole, including its purposes and the way in which Congress intended it to affect the public and the law. *Id.* at 486. Moreover, because we start with a presumption against preemption, "when the text of a pre-emption clause is susceptible of more than one plausible reading, courts ordinarily 'accept the reading that disfavors pre-emption.'" *Altria Group, Inc. v. Good*, 129 S. Ct. 538, 543 (2008) (quoting *Bates v. Dow Agrosciences LLC*, 544 U.S. 431, 449 (2005)).

Defendants argue 47 U.S.C. § 332(c)(7)(B)(iv) expressly preempts Farina's claims. It provides:

> No State or local government or instrumentality thereof may regulate the placement, construction, and modification of personal wireless service facilities on the basis of the environmental effects of radio frequency emissions to the extent that such facilities comply with the Commission's regulations concerning such emissions.

Defendants argue cell phones fall within the definition of "personal wireless service facilities." The statute itself does not provide a clear definition. "Personal wireless service facilities" are defined as "facilities for the provision of personal wireless services," § 332(c)(7)(C)(ii), and "personal wireless services" are in turn defined as "commercial mobile services, unlicensed wireless services, and common carrier wireless exchange access services," § 332(c)(7)(C)(i).

46

Defendants instead urge us to adopt a dictionary definition of "facilities" as "[t]hat which promotes the ease of any action, operation, transaction, or course of conduct." Black's Law Dictionary 591 (6th ed. 1990);[22] *see also* Webster's Third New International Dictionary 812 (1993) (defining facility as "something that promotes the ease of any action, operation, transaction, or course of conduct"). Because cell phones enable wireless communications, defendants allege cell phones "promote the ease" of personal wireless service. But Farina cites to his own dictionary definition for "facility," one which he argues implies a sense of permanence, as with a physical structure. *See* Webster's Third New International Dictionary 812–13 (defining facility as "something (as a hospital, machinery, plumbing) that is built, constructed, installed, or established to perform some particular function or to serve or facilitate some particular end"); *see also* Black's Law Dictionary 591 (defining facility as "[s]omething that is built or installed to perform some particular function").

Because the term itself is ambiguous, we look to the broader context in which "facility" is used. That context supports Farina's reading. Section 332(c)(7), in which subsection (B)(iv) is included, is titled "Preservation of local zoning authority," and subsection (B)(iv) is expressly limited to the "placement, construction, and modification" of facilities.

_____

[22]The current Ninth edition of Black's Law Dictionary does not contain an entry for "facility."

47

This language suggests that the statute is directed at preempting state and local decisions with respect to the physical location of "facilities," a reading which, as Farina contends, requires permanence. *See Pinney*, 402 F.3d at 455 (finding the subsection "deals with the authority of the states *over zoning and land use*"); H.R. Rep. No. 104-204(I), at 94 (1995), *reprinted in* 1996 U.S.C.C.A.N. 10, 61 ("[C]urrent State and local requirements, *siting and zoning decisions* by non-federal units of government, have created an inconsistent and, at times, conflicting patchwork of requirements . . . ." (emphasis added)). The fair reading of this statute, then, focuses on state and local decisions with respect to the physical infrastructure of the wireless network, not cell phones.[23]

Defendants argue that even if § 332(c)(7)(B)(iv) applies only to physical infrastructure, because cell phones are the means by which that infrastructure is accessed, regulation of cell phones on the basis of RF emissions imposes restrictions on the wireless infrastructure. Defendants argue this constitutes a

_____

[23]Defendants allege that if Congress intended only to preempt regulation of infrastructure, it would have said so, instead of "broadly preempt[ing] all state regulation" based on RF emissions. Appellees' Br. at 68. This argument proves too much. Had Congress intended to preempt state regulation of cell phones, it could certainly have said so as well. Congress's statement is only "broad" if "facilities" is read to cover more than just infrastructure. We conclude it should not be.

48

"back-door" regulation of infrastructure, in violation of the principles of *Rowe v. New Hampshire Motor Transport Ass'n*, 552 U.S. 364 (2008). In *Rowe*, the state of Maine enacted a law intended to prevent the sale of tobacco to minors by imposing duties on retailers of tobacco products, including requiring the use of a delivery service that abided by mandated procedures for verifying the identity of recipients. *Id.* at 368–69. Several transport carrier associations challenged the law, arguing it was preempted by 49 U.S.C. § 14501(c)(1), which provides: "[A] state . . . may not enact or enforce a law . . . related to a price, route, or service of any motor carrier . . . with respect to the transportation of property." *Rowe*, 552 U.S. at 368–69. The Supreme Court agreed, finding that although the Maine law did not directly impose duties on carriers, by imposing duties on recipients, the law effectively placed restrictions on carriers. *Id.* at 372.

But *Rowe* is inapposite here. First, the language of the preemption provision in *Rowe* was much broader than the language at issue here. That preemption provision applied to all laws "related to" motor carrier services, *id.* at 368, language that was read broadly enough to reach all laws having even an indirect connection with or reference to motor carrier services, *id.* at 370 (citing *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 384 (1992)); *see also Altria Group*, 129 S. Ct. at 548–49 (distinguishing the phrase "based on" from "relating to"). The language of § 332(c)(7)(B)(iv) is not so broad, covering only regulations of the "placement, construction, and modification of

49

personal wireless service facilities," not regulations "relating to" the "placement, construction, and modification of personal wireless service facilities." That suggests a narrower scope for this preemption provision than the one in *Rowe*.

Second, the burden placed on the wireless infrastructure through regulating cell phones is distinct from the burden resulting from regulating the infrastructure itself. Requiring shippers to use only those carriers who follow certain procedures is no different than requiring carriers to adopt those same procedures. *See Rowe*, 552 U.S. at 372 ("[T]he effect of the regulation is that carriers will have to offer tobacco delivery services that differ significantly from those that . . . the market might dictate. And that being so, treating sales restrictions and purchase restrictions differently for pre-emption purposes would make no sense." (internal quotation marks omitted)). State-law actions imposing liability on the basis of RF emissions from cell phones do not impose identical burdens on the "placement, construction, and modification" of the wireless infrastructure, as they would only require alterations to cell phones, not to the infrastructure itself. Accordingly, it would appear that § 332(c)(7)(B)(iv) does not expressly preempt Farina's suit.[24]

---

[24]Although defendants do not raise it on appeal, they argued before the District Court that § 332(c)(3)(A) also expressly preempted Farina's claims. That subsection provides, in pertinent part:

    [N]o State or local government shall have any

50

> authority to regulate the entry of or the rates charged by any commercial mobile service or any private mobile service, except that this paragraph shall not prohibit a State from regulating the other terms and conditions of commercial mobile services.

47 U.S.C. § 332(c)(3)(A). According to defendants' argument below, state-law standards that add requirements with which cell phones must comply—whether in the form of specific components (i.e., headsets) or additional warnings—before being sold constitute regulations of "entry."

Section 332 does not define what constitutes a regulation of entry, and it appears that the FCC has not clearly defined the term either. *See Peck v. Cingular Wireless, LLC*, 535 F.3d 1053, 1056–57 (9th Cir. 2008). The Fourth Circuit concluded it referred to regulations that obstruct the ability to provide wireless coverage. *Pinney*, 402 F.3d at 456. Although § 332(c)(3)(A) is ambiguous, we think that reading is the proper one. "Entry" must be read in a somewhat limited fashion in order to give effect to the savings provision present in § 332(c)(3)(A). According to defendants' reading, any requirement placed upon wireless service providers would constitute a regulation of entry because providers would have to comply with that requirement prior to selling their goods, or "entering" the market. But almost all regulations of commercial goods set standards or requirements which must be complied

with prior to selling those goods, and § 332(c)(3)(A) specifically reserves a place for state regulation of at least some of the "terms and conditions" of wireless service. As even the FCC has recognized, accepting defendants' reading would eviscerate that savings provision. *See In re Wireless Consumers Alliance, Inc.*, 15 F.C.C.R. 17021, 17040 (2000) (finding that an "award of monetary damages based on state contract or tort causes of action" should fall under the other "terms and conditions provisions of [§] 332"); *cf. Cellular Telecomms. Indus. Ass'n v. FCC*, 168 F.3d 1332, 1336 (D.C. Cir. 1999) ("To equate state action that may increase the cost of doing business with rate regulation would . . . forbid nearly all forms of state regulation, a result at odds with the 'other terms and conditions' portion of [§ 332(c)(3)(A)].").

*Pinney*'s limited reading of "entry" is more consistent with the entire text of § 332(c)(3)(A). Moreover, it is also consistent with other provisions of the TCA. 47 U.S.C. § 253, entitled "Removal of barriers to entry," is directed at preventing state or local regulations that "prohibit the ability of any entity to provide any interstate or intrastate telecommunications service." *Id.* § 253(a); *see also* S. Rep. No. 104-230, at 126 (1996) (Conf. Rep.) (referring to federal prohibition of "State and local statutes and regulations, or other State and local legal requirements, that may prohibit or have the effect of prohibiting any entity from providing interstate or intrastate telecommunications services"). Regulation of entry, then,

52

B.

Defendants also argue that Congress's delegation of "exclusive authority" over the field of RF emission regulation[25] preempts all state laws premised on the sufficiency of those regulations. The doctrine of field preemption applies where "the scheme of federal regulation is sufficiently comprehensive to

appears to refer to laws that erect obstacles to the provision of wireless services. This term would not encompass regulations of cell phones because they only reach devices that access the wireless network, not devices that provide the actual wireless coverage.

[25]We have recognized that "although the term 'field preemption' suggests a broad scope, the scope of a field deemed preempted by federal law may be narrowly defined." *Abdullah v. Am. Airlines, Inc.*, 181 F.3d 363, 367 (3d Cir. 1999). Although there appears to be a difference in breadth between a field defined as regulation of RF emissions and a field defined as regulation of aviation safety, *see id.* at 367–68, or nuclear safety, *see Silkwood v. Kerr-McGee Corp.*, 464 U.S. 238, 249 (1984), other cases have used narrow conceptions of the relevant field, *see Hillsborough Cnty.*, 471 U.S. at 714 (plasmapheresis regulation); *Hughes v. Att'y Gen. of Fla.*, 377 F.3d 1258, 1267–68 (11th Cir. 2004) (commercial airline pilot safety). Because we reject defendants' field preemption claim, we adopt their characterization of the relevant field without consideration.

make reasonable the inference that Congress 'left no room' for supplementary state regulation" or where "the field is one in which 'the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject.'" *Hillsborough Cnty.*, 471 U.S. at 713 (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)). "The question whether the regulation of an entire field has been reserved by the Federal Government is, essentially, a question of ascertaining the intent underlying the federal scheme." *Id.* at 714. With respect to agency regulations, "we must consider whether the regulations evidence a desire to occupy a field completely." *R.J. Reynolds Tobacco Co. v. Durham Cnty.*, 479 U.S. 130, 149 (1986). "Pre-emption should not be inferred, however, simply because the agency's regulations are comprehensive." *Id.*

While the FCC may have "primacy over the areas of technical standards and competitive market structure for cellular service," *Cellular Commc'ns*, 86 F.C.C.2d at 504–05, neither Congress nor the FCC has evinced an intent to occupy the entire field. The TCA and the FCA both contain a savings provision. *See* Pub. L. No. 104-104, § 601(c)(1), 110 Stat. 56, 143 (codified as Note to 47 U.S.C § 152) (stating that the TCA "shall not be construed to modify, impair, or supersede Federal, State, or local law unless expressly so provided"); 47 U.S.C. § 414 ("Nothing in this chapter contained shall in any way abridge or alter the remedies now existing at common law or by statute, but the provisions of this chapter are in addition to such

54

remedies."). These provisions indicate Congress envisioned some role for state law in the field. The presence of a savings provision "is fundamentally incompatible with complete field preemption; if Congress intended to preempt the entire field . . . there would be nothing . . . to 'save,' and the provision would be mere surplusage." *In re NOS Commc'ns*, 495 F.3d 1052, 1058 (9th Cir. 2007); *see also Holk*, 575 F.3d at 338; *Time Warner Cable v. Doyle*, 66 F.3d 867, 878 (7th Cir. 1995). Furthermore, the FCC has repeatedly disclaimed preemptive authority over the entire field of RF regulation. *See FCC Second Order*, 12 F.C.C.R. at 13529; *FCC First Order*, 11 F.C.C.R. at 15183; *Cellular Commc'ns*, 86 F.C.C.2d at 505. Given Congress's and the FCC's demonstrated hesitation to override all state law and recognition of a role for state regulation within the field of RF emissions, we cannot conclude that federal law "so thoroughly occupies a legislative field 'as to make reasonable the inference that Congress left no room for the States to supplement it.'" *Cipollone*, 505 U.S. at 516 (quoting *De la Cuesta*, 458 U.S. at 153).

## C.

Defendants' final asserted ground for dismissal is conflict preemption. Conflict preemption exists (1) "where it is impossible for a private party to comply with both state and federal requirements," or (2) "where state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Fellner*, 539 F.3d at 251 (internal quotation marks omitted). It is likely that compliance

55

with both federal RF standards as well as any hypothetical stricter state standard is possible. Therefore, the basis of defendants' conflict preemption defense is the contention that Farina's suit would erect an obstacle to the accomplishment of the objectives of Congress.

Farina's claims rest on the allegation that defendants warranted that their cell phones were safe to operate, but that these phones were, in fact, unsafe to operate without headsets because of their emission of RF radiation—despite the fact that their emission levels were in compliance with FCC standards. Farina attempts to characterize his claims as consumer claims based only on false and misleading statements. *See* Appellant's Br. at 52; Tr. of Oral Argument at 3; *id.* at 11; *id.* at 38. But although he disavows any challenge to the FCC's RF standards, *see* Appellant's Br. at 53–54; Tr. of Oral Argument at 4; *id.* at 11, that is the essence of his complaint. The representations in the advertising and instructional literature that Farina has identified as false or misleading are warranties that the phones are "safe to operate without the use of a headset and that they were and would be free from defects." Third Am. Compl. ¶ 149; *see also id.* ¶ 141. In order for Farina to succeed, he necessarily must establish that cell phones abiding by the FCC's SAR guidelines are unsafe to operate without a headset. In other words, Farina must show that these standards are inadequate—that they are insufficiently protective of public health and safety. *See Murray v. Motorola, Inc.*, 982 A.2d 764, 775 (D.C. 2009) (agreeing with the district court that "by urging

a jury to find that defendants' cell phones emit unreasonably dangerous levels of RF radiation even though the phones' emissions are within the SAR guidelines adopted by the FCC, plaintiffs are effectively seeking to lower the FCC's current SAR standard"). Whether or not Farina intends to expressly challenge the FCC standards at trial, the inescapable effect of his complaint is to do so.[26] Accordingly, we must determine

[26]In this way, Farina's claims differ from those brought in *Murray* under the District of Columbia Consumer Protection Procedures Act ("CPPA"). There, the plaintiffs alleged cell phone manufacturers and retailers violated District of Columbia law by falsely representing that scientific research established "absolutely no risk of harm associated with the use of cell phones," and by failing to inform consumers that certain measures could be taken to limit RF exposure. *Id.* at 784 (internal quotation marks omitted). The court concluded these claims were not preempted, as the FCC has acknowledged there is no scientific proof that cell phones have absolutely no risk of harm, *id.*, and there is no indication that nonuniformity in disclosures to consumers would hinder FCC regulations, *id.* at 788–89.

Farina's claims do not mirror the CPPA claims, however. The alleged representations made by defendants did not state that there is absolutely no risk of harm from RF radiation; they merely stated that cell phones were compliant with FCC guidelines and free from defects. *See* Third Am. Compl. ¶¶ 141, 149. Similarly, Farina's allegations do not posit a failure to

whether suits challenging the adequacy of the FCC's RF regulations are preempted.

The Supreme Court's preemption case law indicates that regulatory situations in which an agency is required to strike a balance between competing statutory objectives lend themselves to a finding of conflict preemption. *See, e.g.*, *Buckman*, 531 U.S. at 348 ("The conflict stems from the fact that the federal statutory scheme amply empowers the FDA to punish and deter fraud against the Administration, and that this authority is used by the Administration to achieve a somewhat delicate balance of statutory objectives. The balance . . . can be skewed by allowing . . . claims under state tort law."); *City of Burbank v. Lockheed Airport Terminal Inc.*, 411 U.S. 624, 638–39 (1973) ("The Federal Aviation Act requires a delicate balance between safety and efficiency. . . . The interdependence of these factors requires a uniform and exclusive system of federal regulation if the congressional objectives underlying the . . . Act are to be fulfilled."); *cf. Lohr*, 518 U.S. at 501 (refusing to find preemption where the federal law at issue was not one "in which the Federal Government has weighed the competing interests relevant to the particular requirement in question, reached an

disclose information enabling users to mitigate risk, but simply that defendants failed to disclose a defect in their phones—the level of RF emissions—that made them unsafe to operate. *Murray*'s refusal to preempt the CPPA claims, therefore, does not affect our analysis.

unambiguous conclusion about how those competing considerations should be resolved . . . , and implemented that conclusion via a specific mandate on manufacturers or producers").

The reason why state law conflicts with federal law in these balancing situations is plain. When Congress charges an agency with balancing competing objectives, it intends the agency to use its reasoned judgment to weigh the relevant considerations and determine how best to prioritize between these objectives. Allowing state law to impose a different standard permits a re-balancing of those considerations. A state-law standard that is more protective of one objective may result in a standard that is less protective of others.

In *Geier v. American Honda Motor Co.*, for example, the Supreme Court found a suit alleging that an automobile was defectively designed because it lacked an airbag conflicted with a Department of Transportation ("DOT") regulation authorizing manufacturers to choose between a range of passive restraint devices. 529 U.S. 861, 886 (2000). In setting its standard, the DOT was required to consider not only safety, but also the cost to consumers of additional safety measures, the encouragement of technological development, and consumer preferences. *Id.* at 875; *id.* at 877–79 (detailing the specific considerations behind the DOT standard). Because the DOT was required to factor in all of these considerations, permitting alternative state standards to arise via the imposition of liability in a tort suit would conflict with the DOT's deliberate policy choice. *Id.* at 881; *see also*

*Wyeth*, 129 S. Ct. at 1203 ("Examining the rule itself and the DOT's contemporaneous record, which revealed the factors the agency had weighed and the balance it had struck, we determined that state tort suits presented an obstacle to the federal scheme.").

Similarly, in *Buckman*, the Court preempted a tort suit premised on the defendant's alleged fraudulent misrepresentations made to the FDA in seeking approval to market orthopedic bone screws. 531 U.S. at 353. The Court found Congress had "amply empower[ed]" the FDA to punish misrepresentations and that the FDA had used this punitive authority in cases to balance between its statutory objectives. *Id.* at 348. In particular, the FDA was required to "ensure both that medical devices are reasonably safe and effective and that . . . [an approved device] is on the market within a relatively short period of time." *Id.* at 349–50. "[F]lexibility" in "pursu[ing] difficult (and often competing) objectives" was essential to the FDA's mandate. *Id.* at 349. Altering the balance struck by the FDA to protect safety to a greater degree would "dramatically increase the burdens" on industry by requiring compliance with various state standards and diminish the expediency of the approval process. *Id.* at 350–51.

Defendants argue that Farina's suit conflicts with FCC regulations in a similar way, claiming a finding of liability would upset the balance struck by the FCC in setting its RF standards. Defendants contend that Congress delegated authority to the FCC to ensure the creation of a uniform and

60

efficient nationwide wireless service. Allowing a jury decision to potentially set stricter RF standards, they say, would upset the FCC's delicate balancing of efficiency and uniformity with the health and safety of the public.

The stated purpose behind the FCA is to "regulat[e] interstate and foreign commerce in communication by wire and radio so as to make available . . . a rapid, efficient, Nation-wide, and world-wide wire and radio communication service with adequate facilities at reasonable charges . . . ." 47 U.S.C. § 151. In setting standards for wire and radio communications, the FCC must also consider the promotion of "the safety of life and property." 47 U.S.C. § 332(a)(1). An essential element of an efficient wireless network is a system that is subject to uniform technical standards. *See Fed. Radio Comm'n v. Nelson Bros. Bond & Mortg. Co.*, 289 U.S. 266, 279 (1933) ("No state lines divide the radio waves, and national regulation is not only appropriate but essential to the efficient use of radio facilities."); H.R. Rep. No. 104-204(I), at 95, *reprinted in* 1996 U.S.C.C.A.N. at 61–62 ("A high quality national wireless telecommunications network cannot exist if each of its component[s] must meet different RF standards in each community."). As the House Committee on Commerce declared in approving the TCA:

> [I]t is in the national interest that uniform, consistent requirements, with adequate safeguards of the public health and safety, be established as soon as possible. Such requirements will ensure

61

an appropriate balance in policy and will speed deployment and the availability of competitive wireless telecommunications services which ultimately will provide consumers with lower costs as well as with a greater range and options for such services.

H.R. Rep. No. 104-204(I), at 94, *reprinted in* 1996 U.S.C.C.A.N. at 61.

Moreover, uniformity in regulation helps ensure that adequate service is accessible throughout the country at a low cost. *See Cellular Commc'ns*, 86 F.C.C.2d at 503. "[U]niversal service is a cornerstone of the Nation's communication system." S. Rep. No. 104-23, at 25 (1995). "[O]ne of the fundamental concerns" of wireless regulation is the need to further universality, *id.* at 4, and this goal is to be served, in part, by "providing quality services at just, reasonable, and affordable rates[ and] providing access to advanced telecommunications and information services in all regions of the nation . . . ." *Id.* at 5. Accordingly, the FCC was tasked not only with protecting the health and safety of the public, but also with ensuring the rapid development of an efficient and uniform network, one that provides effective and widely accessible service at a reasonable cost.

How precisely to serve these objectives "is a policy question, not a legal one." *Cellular Phone Taskforce v. FCC*, 205 F.3d 82, 91 (2d Cir. 2000). In order to satisfy both its

62

mandates to regulate the safety concerns of RF emissions and to ensure the creation of an efficient and uniform nationwide network, the FCC was required to weigh those considerations and establish a set of standards that limit RF emissions enough to protect the public and workers while, at the same time, leave RF levels high enough to enable cell phone companies to provide quality nationwide service in a cost-effective manner. The FCC itself recognized: "We believe our decisions provide a proper balance between the need to protect the public and workers from exposure to potentially harmful RF electromagnetic fields and the requirement that industry be allowed to provide telecommunications services to the public in the most efficient and practical manner possible." *FCC Second Order*, 12 F.C.C.R. at 13496. The SAR guidelines, therefore, represent the FCC's considered judgment about how to protect the health and safety of the public while still leaving industry capable of maintaining an efficient and uniform wireless network.

> The FCC concluded that requiring exposure to be kept as low as reasonably achievable in the face of scientific uncertainty would be inconsistent with its mandate to balance between the need to protect the public . . . and the requirement that industry be allowed to provide telecommunications services to the public in the most efficient and practical manner possible.

*Cellular Phone Taskforce*, 205 F.3d at 92 (internal quotation

marks omitted).

This is a situation "in which the Federal Government has weighed the competing interests relevant to the particular requirement in question, reached an unambiguous conclusion about how those competing considerations should be resolved in a particular case or set of cases, and implemented that conclusion via a specific mandate on manufacturers or producers." *Lohr*, 518 U.S. at 501. Here, the FCC has weighed the competing interests relevant to RF regulations—safety and efficiency. It has reached an unambiguous conclusion by adopting the hybrid ANSI/IEEE-NCRP set of standards, *see* 47 C.F.R. § 2.1093(d), and it has implemented that conclusion via a specific mandate, requiring every cell phone sold in the United States to comply with those standards, *see* 47 C.F.R. §§ 2.803(a)(1); 24.51–.52.

Allowing juries to impose liability on cell phone companies for claims like Farina's would conflict with the FCC's regulations. A jury determination that cell phones in compliance with the FCC's SAR guidelines were still unreasonably dangerous would, in essence, permit a jury to second guess the FCC's conclusion on how to balance its objectives. Were the FCC's standards to constitute only a regulatory floor upon which state law can build, juries could re-balance the FCC's statutory objectives and inhibit the provision of quality nationwide service. Because the intensity of RF emission levels and the strength and range of cell phone signals are positively correlated, allowing additional state-law

64

restrictions on these levels could impair the efficiency of the wireless market. But given the current state of the science, the FCC considers all phones in compliance with its standards to be safe. *See FCC First Order*, 11 F.C.C.R. at 15184 ("We believe that the regulations . . . represent the best scientific thought and are sufficient to protect the public health."). These standards represent a "consensus view" of the agencies with jurisdiction over RF emissions and incorporate the views of numerous expert organizations and interested parties. *Id*. at 15124. As an agency engaged in rulemaking, the FCC is well positioned to solicit expert opinions and marshal the scientific data to ensure its standards both protect the public and provide for an efficient wireless network. Allowing juries to perform their own risk-utility analysis and second-guess the FCC's conclusion would disrupt the expert balancing underlying the federal scheme. *See Buckman*, 531 U.S. at 348 (finding preemption where "a somewhat delicate balance of statutory objectives" could be "skewed by allowing . . . claims under tort law"); *cf. Riegel*, 552 U.S.at 325 ("State tort law that requires a manufacturer's catheter to be safer, but hence less effective, than the model the FDA has approved disrupts the federal scheme . . . .").

Moreover, the resulting state-law standards could vary from state to state, eradicating the uniformity necessary to regulating the wireless network. The wireless network is an inherently national system. In order to ensure the network functions nationwide and to preserve the balance between the FCC's competing regulatory objectives, both Congress and the

65

FCC recognized uniformity as an essential element of an efficient wireless network. *See* H.R. Rep. 104-204 (I), at 94–95, *reprinted in* 1996 U.S.C.C.A.N. at 61–62; *Cellular Commc'ns*, 86 F.C.C.2d at 503; *cf.* Thomas W. Hazlett, *Federal Preemption in Cellular Phone Regulation*, *in* Federal Preemption 113, 124–25 (Richard A. Epstein & Michael S. Greve eds., 2007) (describing the benefits of uniform federal regulation in other aspects of the wireless network). Subjecting the wireless network to a patchwork of state standards would disrupt that uniformity and place additional burdens on industry and the network itself. *Cf. Buckman*, 531 U.S. at 350 ("As a practical matter, complying with the FDA's detailed regulatory regime in the shadow of 50 States' tort regimes will dramatically increase the burdens facing potential applicants . . . ."). This would hinder the accomplishment of the full objectives behind wireless regulation.

In concluding that state-law causes of action like Farina's may disturb the FCC's balance of its statutory objectives, we afford some weight to the views of the FCC itself. While we do not defer to an agency's legal conclusion that state law is preempted, where "the subject matter is technical and the relevant history and background are complex and extensive" we defer to "an agency's explanation of how state law affects the regulatory scheme." *Wyeth*, 129 S. Ct. at 1201 (alteration and internal quotation marks omitted). Because agencies "have a unique understanding of the statutes they administer[, they possess] an attendant ability to make informed determinations

66

about how state requirements may pose an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Id.* (internal quotation marks omitted). "The weight we accord the agency's explanation . . . depends on its thoroughness, consistency, and persuasiveness." *Id.* The FCC, in its notice of rulemaking, explicitly stated the adoption of its SAR guidelines constituted a balancing of safety and efficiency. *FCC Second Order*, 12 F.C.C.R. at 13496. It has also cautioned, in an amicus brief before the Court of Appeals for the District of Columbia in *Murray*, that state-law claims would upset that balance. Both of these views support a finding of preemption.

Farina objects, arguing we should afford no deference to the FCC's statements because the FCC's position on preemption is inconsistent with its prior statements on the issue. In *Wyeth*, the Supreme Court refused to defer to the FDA's view advocating its preemptive authority because the agency had previously asserted that state law did not erect an obstacle to the agency's objectives. 129 S. Ct. at 1201–02; *see also Riegel*, 552 U.S. at 326 (stating that "the degree of deference [given to an agency explanation] might be reduced by the fact that the agency's earlier position was different"). Farina highlights statements by the FCC that purport to disclaim the authority to promulgate safety standards and to reject the preemptive authority of its RF regulations. *See FCC First Order*, 11 F.C.C.R. at 15101 (recognizing that "[t]he FDA has general jurisdiction for protecting the public from potentially harmful

radiation from consumer and industrial devices and in that capacity is expert in RF exposures"); *Responsibility*, 100 F.C.C.2d at 551 ("[W]e have neither the expertise nor the jurisdiction to develop our own radiation exposure guidelines . . . ." (emphasis omitted)); *see also FCC Second Order*, 12 F.C.C.R. at 13529 (refusing to decide whether or not state and local regulations of RF emissions should be preempted); *FCC First Order*, 11 F.C.C.R. at 15183 (same); *Responsibility*, 100 F.C.C.2d at 558 ("[W]e do not believe it is necessary at this time to resolve the issue of federal preemption of state and local RF standards.") .

To the extent Farina argues these statements evince the FCC's rejection of preemption, he overreads them. First, the fact that the FCC does not possess sole jurisdiction over health and safety standards does not preclude a finding of preemption. *See City of Burbank*, 411 U.S. at 638–39 (finding preemption where authority over regulating airplane noise was vested in both the EPA and the Federal Aviation Administration). Second, the FCC has been consistent in its position on preemption. Although it has previously refused to express a view on whether state and local RF regulations are preempted, its refusal was explicitly based on the fact that no significant conflict between state law and its regulations existed. *See, e.g.*, *FCC First Order*, 11 F.C.C.R. at 15182 ("To date the Commission has declined to preempt on health and safety matters. However, the Commission has noted that should non-Federal RF radiation standards be adopted that adversely affect

68

a licensee's ability to engage in Commission-authorized activities, the Commission would consider reconsidering whether Federal action is necessary."); *Responsibility*, 100 F.C.C.2d at 558 (same). The FCC has always reserved the question of the preemptive authority of its RF regulations pending the existence of an actual conflict, and its current position is consistent with that approach. Accordingly, we think the FCC's position on preemption merits deference.[27]

---

[27] Farina also contends *Wyeth* precludes deference to agency statements made outside of notice-and-comment rulemaking procedures. In *Wyeth*, the Supreme Court refused to defer to the FDA's views in part because they were expressed in a preamble to an FDA regulation whose notice of proposed rulemaking had declared it would not contain preemptive regulations. 129 S. Ct. at 1201. The FDA's views were "inherently suspect in light of this procedural failure." *Id.*

We do not read this passage as standing for the proposition that only statements made pursuant to notice-and-comment rulemaking can be afforded deference. The deference at issue in *Wyeth* was *Skidmore* deference, *see Skidmore v. Swift & Co.*, 323 U.S. 134 (1944), not *Chevron* deference, *see Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984). The latter level of deference applies only to statements carrying the force of law, but *Skidmore* deference is not so limited. *See United States v. Mead Corp.*, 533 U.S. 218, 234–35 (2001) (applying *Skidmore* deference to an advisory ruling letter). Instead, we read the Court's reference to the

Farina raises several objections to a finding of preemption. First, he argues preemption is unwarranted because the FCC lacks authority to regulate the safety effects of RF

---

FDA's "procedural failure" to be more properly considered a defect in the thoroughness of the FDA's views. Having disavowed any intent to issue preemptive regulations in its notice of proposed rulemaking, the FDA would not have received and considered the comments of all interested parties. In light of the lack of exposure to conflicting views, the FDA's position would lack thoroughness. Here, in contrast, the FCC received numerous comments regarding preemption, *see FCC First Order*, 11 F.C.C.R. at 15128 ("[A] significant number of parties addressed the issue of Federal preemption of state and local regulations for RF exposure."), and did not disavow issuing preemptive regulations in its notice of proposed rulemaking prior to the *FCC First Order*, *see NPR FCC First Order*, 8 F.C.C.R. 2849.

Although the fact that an agency's views on preemption are expressed informally can limit the deference given, *see Fellner*, 539 F.3d at 250–51, at least here, where the FCC was exposed to conflicting views, we do not think deference is unwarranted, *cf. id.* at 250 n.8 (citing the agency's lack of exposure to competing views as a rationale for refusing to defer to an informal agency statement). Regardless, the FCC's recognition of the balance behind its RF regulations was also expressed in a formal proceeding, and we believe that deserves deference. *FCC Second Order*, 12 F.C.C.R. at 13496.

70

emissions.  Because the FCC is not an agency in the field of health and safety, Farina contends it cannot pass preemptive safety regulations.  Moreover, he argues that, in passing its RF standards, the FCC acted pursuant to its obligations under NEPA.  *See, e.g.*, *FCC Second Order*, 12 F.C.C.R. at 13499 ("To meet its responsibilities under NEPA, the Commission has adopted requirements for evaluating the environmental impact of its actions.  One of several environmental factors addressed by these requirements is human exposure to RF energy . . . ." (footnote omitted)).  Because NEPA applies broadly to all federal agencies and is not a statute within the FCC's exclusive purview, he argues it cannot have preemptive effect.

But although the FCC's RF regulations were triggered by the Commission's NEPA obligations, health and safety considerations were already within the FCC's mandate, 47 U.S.C. §§ 151, 332(a), and all RF regulations were promulgated under the rulemaking authority granted by the FCA, *see, e.g.*, *FCC Second Order*, 12 F.C.C.R. at 13562; *FCC First Order*, 11 F.C.C.R. at 15185.[28]  Furthermore, while the FCC arguably

---

[28]The district court concluded that the FCC regulated cell phone RF emissions pursuant only to its authority under NEPA.  The court in Murray did not believe that whether the FCC promulgated its RF regulations under NEPA or "pursuant to specific radio-communications legislation," Murray, 982 A.2d at 778 n.19, was important because, in the TCA, Congress explicitly instructed the FCC to "make effective rules regarding

71

lacks the expertise to design its own scientific health and safety standards, *see Responsibility*, 100 F.C.C.2d at 551, it does possess the expertise to select a standard developed by other expert agencies and organizations and balance that against efficiency, *see id.* (recognizing the FCC "does have the expertise and authority to recognize technically sound standards promulgated by reputable and competent organizations" (emphasis omitted)). The FCC need not be expert enough to devise its own SAR standard to adopt a preemptive regulation. In *City of Burbank*, the Supreme Court evaluated FAA regulations of airplane noise control under the Noise Control Act of 1972. 411 U.S. at 628–29. These regulations were promulgated only after the EPA submitted to the FAA proposed regulations "necessary to protect the public health and welfare." *Id.* at 630. Despite the fact that the EPA assisted in the formulation of federal standards, the Court held the FAA's authority preempted state law. *Id.* at 640.

Farina's second argument is that the Supreme Court's recent opinion in *Wyeth* requires us to reject preemption here.

the environmental effects of [RF] emissions." Pub. L. No. 104-104, § 704(b), 110 Stat. 56, 152. The Murray court concluded that § 704(b) delegated authority to the FCC to regulate RF radiation from cell phones. See Murray, 982 A.2d at 786 n.37. This interpretation has some force, but we do not rely on § 704(b).

72

In *Wyeth*, the plaintiff, Diana Levine, suffered injuries resulting from the administration of phenergan, an antihistamine, by the IV-push method. 129 S. Ct. at 1191. Phenergan can be administered in two possible ways—either through the IV-push method, in which the drug is injected directly into the vein, or through its introduction into saline solution that drips into the vein via a catheter. *Id.* Levine alleged the drug's labeling, although approved by the FDA, was inadequate because it failed to instruct practitioners not to use the riskier IV-push method. *Id.* at 1191–92.

The Court held Levine's suit was not preempted by the FDA's approval of phenergan's label. *Id.* at 1204. The Court first found that Congress had long recognized a complementary role for state-law causes of action under the Food, Drug, and Cosmetic Act ("FDCA"). *Id.* at 1199–1200. This awareness, when paired with Congress's refusal to enact an express preemption provision dealing with prescription drugs, indicated Congress did not intend to displace state law. *Id.* at 1200. Moreover, the Court refused to defer to the FDA's current position on preemption, *id.* at 1201–02, and the agency itself had traditionally regarded state law as a complement to federal regulations, *id.* at 1202. Finally, the FDA's approval of phenergan's label did not reflect a balancing of competing objectives, as in cases like *Geier*, because the FDA had not even considered requiring a warning against the IV-push method. *Id.* at 1203 n.14.

Farina argues these aspects of *Wyeth* support his

73

argument against preemption. We disagree. First, there is no indication, as there was in *Wyeth*, that either Congress or the FCC traditionally viewed state regulation of RF emissions as a necessary complement to federal regulation. The FCC has acknowledged that traditionally little state regulation of RF emissions existed. *FCC First Order*, 11 F.C.C.R. at 15183 ("It would appear from the comments that a few [state and local RF] regulations have been imposed . . . ."). The Commission has historically recognized a role for state law only to the extent it does not conflict with federal law, and has taken the position that state-law suits like Farina's would conflict with its regulations.[29]

---

[29]Farina also emphasizes that the *Wyeth* Court recognized state law as a necessary complement because the FDA lacked the resources to monitor all new information about the vast amount of pharmaceuticals on the market. *See id.* at 1202 & n.11. Farina argues this counsels against finding preemption here because the FDA has stated that it lacks adequate resources to regulate the health and safety effects of RF radiation. It is not clear how the sufficiency of the FDA's resources would have an effect upon the preemptive authority of FCC regulations. Farina makes no corresponding argument that the FCC lacks sufficient resources to monitor the risks of RF emissions. Moreover, the costs of monitoring the adequacy of a generally applicable set of RF standards would presumably be far less than those of monitoring the adequacy of the labels for thousands of distinct pharmaceuticals.

74

Moreover, the lack of an express preemption provision covering claims like Farina's does not necessarily mean Congress intended to preserve conflicting state law. We do not read *Wyeth*'s reference to Congress's decision not to enact an express preemption provision, *see id.* at 1200 ("If Congress thought state-law suits posed an obstacle to its objectives, it surely would have enacted an express pre-emption provision at some point during the FDCA's 70-year history."), as standing for the proposition that conflict preemption should not be found absent an express preemption provision. Such a reading would come too close to subsuming conflict preemption into express preemption analysis, and is inconsistent with the axiom that an express preemption provision does not "bar the ordinary working of conflict pre-emption principles," *Geier*, 529 U.S. at 869. In any case, we recognize that Congress did pass two express preemption provisions in the TCA. *See* 47 U.S.C. §§ 332(c)(3)(A), (c)(7)(B)(iv). While they do not cover Farina's claims, they do manifest Congress's express intent to preempt some state law, which distinguishes this case from *Wyeth*.

Finally, as the Court itself recognized, *Wyeth* was not a balancing case. 129 S. Ct. at 1203. State-law actions seeking to impose liability for inadequate warnings would not conflict with the FDA's labeling approval because both were designed to serve the same objective—protecting public safety. *Id.* at 1199–1200. State tort law would merely provide additional protection. Protecting public safety is clearly within the mandate of the FCC. *See* 47 U.S.C. § 332(a)(1); H.R. Rep. No.

75

104-204(I), at 94, *reprinted in* 1996 U.S.C.C.A.N. at 61 (discussing the need for "adequate safeguards of the public health and safety" in RF regulations). But the Commission was not charged only with protecting the public from RF emissions; it was also required to ensure the development of an efficient wireless network. The Commission's balance of these interests would be skewed by additional state restrictions on RF emissions in a manner that the objectives behind pharmaceutical labels would not be. Accordingly, *Wyeth* does not provide sufficient grounds to alter our conclusion.

Farina's third argument posits that the presence of a savings provision in the TCA limits the preemptive authority of FCC regulations. Section 601(c)(1) of the TCA provides: "This Act and the amendments made by this Act shall not be construed to modify, impair, or supersede Federal, State, or local law unless expressly so provided in such Act or amendments." Pub. L. No. 104-104, §601(c)(1), 110 Stat. 56, 143 (codified as Note to 47 U.S.C. § 152). It is entitled "No Implied Effect." Farina argues this section demonstrates Congress's intent to limit the preemption of state law to only those situations covered by an express preemption provision. *See* H.R. Rep. No. 104-458, at 201 (1996) (Conf. Rep.) ("This provision prevents affected parties from asserting that the bill impliedly preempts other laws."). Because neither § 332(c)(7)(B)(iv) nor § 332(c)(3)(a) reach Farina's claims, he would have us conclude his suit cannot be preempted.

Farina's argument is not without some force. It is a

76

possible reading of § 601(c)(1) to conclude Congress made a conscious effort to limit the scope of any subsequent preemption analysis. And because congressional intent is the "ultimate touchstone" of our inquiry, *Lohr*, 518 U.S. at 485 (internal quotation marks omitted), it is conceivable that § 601(c)(1) could be dispositive, *see Pinney*, 402 F.3d at 458 (concluding that the presence of § 601(c)(1) counseled against a finding of conflict preemption). But it is a general rule in preemption analysis that a savings provision does not "bar the ordinary working of conflict pre-emption principles." *Geier*, 529 U.S. at 869. Moreover, where the federal regulatory scheme reflects a careful balancing, savings provisions should not be given broad effect, *id.* at 870, lest they "permit[ a] law to defeat its own objectives, or potentially . . . to 'destroy itself.'" *Id.* at 872 (quoting *AT&T Co. v. Cent. Office Tel., Inc.*, 524 U.S. 214, 228 (1998)).

> Why, in any event, would Congress not have wanted ordinary pre-emption principles to apply where an actual conflict with a federal objective is at stake? Some such principle is needed. In its absence, state law could impose legal duties that would conflict directly with federal regulatory mandates . . . . [I]t would take from those who would enforce a federal law the very ability to achieve the law's congressionally mandated objectives that the Constitution, through the operation of ordinary pre-emption principles,

77

seeks to protect.

*Id.* at 871–72.

Such a reading would be odd, then, given the fact that the FCC's RF regulations represent a balance of competing objectives. In cases where an agency's regulation reflects a single objective, it may make sense for Congress to declare that state law is displaced only in the specific situations covered by an express preemption provision. By doing so, Congress could ensure state law serves as a complement to federal regulation, which would further advance the agency's statutory objective. But where the agency's regulations represent a balance, the presence of state-law regulations does not serve as a complement, but rather re-balances the relevant considerations. *See Buckman*, 531 U.S. at 348. This is precisely the type of situation where a broad reading of a savings provision could allow the law to "defeat its own objectives." *Geier*, 529 U.S. at 872.

Accordingly, we hesitate to read § 601(c)(1) in a way that disclaims preemption even in the face of an actual conflict. "We do not claim that Congress lacks the constitutional power to write a statute that mandates such a complex type of state/federal relationship." *Id.* But where the language permits another reasonable reading, it may be more prudent to adopt that alternative rather than the one that could do violence to the statute's objectives. It is not clear that § 601(c)(1) indicates Congress was willing to preserve state law that created actual

conflicts with federal law. Even assuming that Congress may have been clarifying its intent not to preempt some state law, a clarification of intent not to preempt some state law is not a statement of intent to permit actual conflicts between state and federal law.

While the presence of a savings provision does not affect the actual workings of conflict preemption, it can provide an indication of congressional intent as to a statute's objectives. As such, a savings provision could inform our analysis of whether a conflict exists without offending the principles of conflict preemption. Section 601(c)(1), then, could indicate that Congress's objectives are more limited than they might otherwise be characterized. While an actual conflict would still be preempted, such a conflict would be harder to find under this less expansive view of the statute's objectives.

But this is merely one data point out of many we use to discern congressional intent, and "a narrow focus on Congress' intent to supersede state law is misdirected, for a pre-emptive regulation's force does not depend on express congressional authorization to displace state law." *City of New York v. FCC*, 486 U.S. 57, 64 (1988) (alterations and internal quotation marks omitted); *see also Geier*, 529 U.S. at 884. Moreover, the broad instruction in the TCA to promulgate rules governing RF emissions appears sufficient to authorize the FCC to pass preemptive regulations. *See De la Cuesta*, 458 U.S. at 153–54 (recognizing that when an agency issues preemptive regulations, the question of congressional intent focuses on whether those

79

regulations fall within the agency's delegated authority).

In addition, Congress has already shown the intention to override nonuniform state-law RF standards that conflict with federal regulation of the wireless infrastructure. In passing § 332(c)(7)(B)(iv), Congress recognized that "current State and local requirements, siting and zoning decisions by non-federal units of government, have created an inconsistent and, at times, conflicting patchwork of requirements which will inhibit . . . the rebuilding of a digital technology-based cellular telecommunications network." H.R. Rep. No. 104-204(I), at 94, *reprinted in* 1996 U.S.C.C.A.N. at 61. The presence of inconsistent state-law regulations of the infrastructure created conflicts with the FCC's RF regulations and led to the enactment of an express preemption provision. Congress, therefore, was clearly concerned with state-law RF standards applicable to infrastructure that threatened to limit the efficiency and uniformity of the wireless network. Cell phones are as integral to the wireless network as the infrastructure, and regulations of phones can have similar effects on the effectiveness of wireless service as regulations of the infrastructure. *Cf. NPR Rural*, 18 F.C.C.R. at 20830 (stating that the biggest limitations on the ability of a base station to reach a cell phone are the power level of the signal and the location of the phone in relation to the base station). We think Congress would be equally concerned with state regulations of cell phones that could impose similar limitations on the range and efficiency of the wireless network. Section 601(c)(1),

80

therefore, does not bar the preemption of Farina's suit.[30]

Farina's final argument is that even if the FCC did strike a balance to protect safety and efficiency, the precise relief he seeks—requiring cell phones to carry headsets—would have no effect upon the efficiency of the wireless network.[31]  The Fourth Circuit found this argument convincing.  *See Pinney*, 402 F.3d at 458 ("It is difficult to understand how a headset requirement (the specific relief sought) would affect the establishment of a nationwide wireless service network or the availability of wireless service coverage. . . . [A]ccordingly, a headset requirement would not stand as an obstacle to Congress's goal of achieving nationwide coverage.").

But we think the focus on the headset requirement is

---

[30]Farina also points to an additional savings provision in 47 U.S.C. § 414, providing:  "Nothing in this chapter contained shall in any way abridge or alter the remedies now existing at common law or by statute . . . ."  This provision applies generally, and as such, does not provide strong evidence of the congressional objectives bound up with the regulation of RF emissions.  We decline to read this provision in a way that limits our conflict preemption analysis.

[31]Although Farina primarily requests the provision of headsets or compensation for the cost of headsets, his complaint requests several additional forms of relief, including money damages, punitive damages, and a declaratory judgment.

misplaced. For the purposes of preemption analysis, it is the cause of action, and not the specific relief requested, that matters. Preemption speaks in terms of claims, not in terms of forms of relief. *See, e.g.*, *Wyeth*, 129 S. Ct. at 1191 ("The question we must decide is whether the FDA's approvals provide Wyeth with a complete defense to Levine's tort *claims*." (emphasis added)); *Riegel*, 552 U.S. at 323 (reading *Lohr* to have held that "common-law *causes of action* for negligence and strict liability" were subject to preemption by certain federal regulations (emphasis added)); *see also Wood v. Prudential Ins. Co. of Am.*, 207 F.3d 674, 678 (3d Cir. 2000) (noting that preemption "does not depend on the type of relief requested in a complaint"). Any form of relief shapes a defendant's behavior, which can conflict with federal law objectives. *See Cipollone*, 505 U.S. at 521 (Stevens, J., concurring) ("[S]tate regulation can be as effectively exerted through an award of damages as through some form of preventative relief. The obligation to pay compensation can be . . . a potent method of governing conduct and controlling policy." (quoting *San Diego Bldg. Trades Council v. Garmon*, 359 U.S. 236, 247 (1959)) (alteration omitted)); *see also Riegel*, 552 U.S. at 324; *cf. N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 277 (1964) ("What a State may not constitutionally bring about by means of a criminal statute is likewise beyond the reach of its civil laws . . . .").

Furthermore, although Farina attempts to characterize his suit as setting a headset requirement, this misapprehends the effect a finding of liability would have in this kind of suit. The

82

nature of jury decisions is not to prescribe a specific prospective remedy. It is merely to say that defendants' conduct does not abide by the operative legal standard—in this case, that defendants' cell phones are unsafe—and to provide relief for the specific case or cases before the court. How defendants achieved safe levels of SAR exposure for cell phones sold in the future would be left up to them.[32] Whether they complied by reducing RF emissions or by bundling headsets with phones—or by some other means—would be irrelevant for the purposes of the new state-law standard. In both situations, the phones would be considered "safe" under state law. Nor should the specific means of compliance matter for preemption purposes.

Accordingly, we conclude that Farina's claims are

---

[32]We do not imply that a state statute or regulation prescribing a specific means of reducing or eliminating SAR exposure—such as one requiring a headset for all cell phones sold within a state—would not be preempted. We merely recognize that a distinction exists between the two forms of state regulation. *See Riegel*, 552 U.S. at 325 ("Indeed, one would think that tort law, applied by juries . . . , is less deserving of preservation. A state statute, or a regulation adopted by a state agency, could at least be expected to apply cost-benefit analysis similar to that applied by the experts at the FDA . . . ."). We reference this distinction only because Farina's characterization of his suit as setting a headset requirement insinuates no distinction is present.

preempted by the FCC's RF regulations. The inexorable effect of allowing suits like Farina's to continue is to permit juries to second-guess the FCC's balance of its competing objectives. The FCC is in a better position to monitor and assess the science behind RF radiation than juries in individual cases. Regulatory assessments and rulemaking call upon a myriad of empirical and scientific data and medical and scientific opinion, especially in a case, such as RF radiation, where the science remains inconclusive. Though we foreclose relief for the members of this putative class, this does not render them devoid of protection. The FCC has pledged to serve an ongoing role in the regulation of RF radiation and to monitor the science in order to ensure its regulations remain adequate to protect the public. OET Bulletin at 8; *see also EMR Network v. FCC*, 391 F.3d 269, 273 (D.C. Cir. 2004) (noting the FCC's "determination to keep an eye on developments" and accommodate changes in the science). Allowing juries to determine instead whether those regulations are adequate to protect the public would "stand[] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hillsborough Cnty.*, 471 U.S. at 713 (internal quotation marks omitted).[33]

---

[33]Farina also alleges defendants' cell phones are defective because they represent a safety risk when used without headsets while driving. Third Am. Compl. ¶ 151. But whether or not the FCC has authority over the matter of driver safety, the effect of Farina's suit would be to require the redesign of cell phones. This presents the same conflict as his other claims. We

84

## IV.

For the foregoing reasons, we will affirm the District Court's dismissal of Farina's complaint.

---

therefore reject Farina's driver safety argument for the same reasons as his other claims.