**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 11-1406
_____

MABEY BRIDGE & SHORE, Inc.,
                                        Appellant

v.

BARRY J. SCHOCH, Secretary of Transportation of
the Commonwealth of Pennsylvania[1]
_____

APPEAL FROM THE UNITED STATES DISTRICT
COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
(D.C. Civil No. 10-cv-01474)
District Judge:  Honorable Sylvia H. Rambo
_____

Argued:  December 6, 2011
_____

Before: HARDIMAN, BARRY and VAN ANTWERPEN,
Circuit Judges

(Opinion Filed: January 24, 2012)
_____

James M. Campbell, Esq. (Argued)
Campbell, Campbell, Edwards & Conroy
One Constitution Plaza

---

[1] Substituted for Allen D. Biehler pursuant to Federal Rule of
Appellate Procedure 43(c)(2).

1

Third Floor
Boston, MA  02129
-and-
Kristen E. Dennison, Esq.
Katherine A. Wang, Esq.
Campbell, Campbell, Edwards & Conroy
690 Lee Road
Suite 300
Wayne, PA  19087
-and-
Margaret F. Ward, Esq.
Ward & Herzog
102 West Pennsylvania Avenue
Suite 401
Baltimore, MD  21204

Counsel for Appellant


Claudia M. Tesoro, Esq. (Argued)
Office of Attorney General of Pennsylvania
3rd Floor
21 South 12th Street
Philadelphia, PA  19107
-and-
Patrick S. Cawley, Esq.
Kenneth L. Joel, Esq.
Calvin R. Koons, Esq.
Office of Attorney General of Pennsylvania
Strawberry Square
Harrisburg, PA 17120

Counsel for Appellee

_____

OPINION OF THE COURT
_____

BARRY, Circuit Judge

This case presents the question of whether the

2

Pennsylvania Steel Products Procurement Act ("Steel Act"), 73 Pa. Cons. Stat. §§ 1881-1887, is unconstitutional insofar as it prohibits the use of temporary bridges made out of foreign steel on public works projects. Appellant Mabey Bridge & Shore, Inc. ("Mabey") appeals the District Court's grant of summary judgment on its claim that the Steel Act (and the Department of Transportation's interpretation thereof) is preempted by the Buy America Act, 23 U.S.C. § 313, as well as on its claims that the Steel Act violates the Commerce Clause, Contract Clause, and Equal Protection Clause of the United States Constitution. We will affirm.

## I.

In 1978, the Commonwealth of Pennsylvania enacted the Steel Act, which requires that steel products used or supplied in the performance of a public works contract must be made in the United States. In particular, the Act provides:

> Every public agency shall require that every contract document for the construction, reconstruction, alteration, repair, improvement or maintenance of public works contain a provision that, if any steel products are to be used or supplied in the performance of the contract, only steel products as herein defined shall be used or supplied in the performance of the contract or any subcontracts thereunder.

73 Pa. Cons. Stat. § 1884(a). The Act defines the term "steel products" as "[p]roducts rolled, formed, shaped, drawn, extruded, forged, cast, fabricated or otherwise similarly processed . . . *from steel made in the United States*." *Id*. § 1886 (emphasis supplied). "Public works" is defined, in relevant part, as "[a]ny structure, . . . bridge, . . . or other betterment, work or improvement whether of a permanent or temporary nature and whether for governmental or proprietary use." *Id*.

The only statutory exception to the Act's requirement of steel made in the United States is where the "head of the

public agency, in writing, determines that steel products as herein defined are not produced in the United States in sufficient quantities to meet the requirements of the contract." *Id*. § 1884(b). A Pennsylvania Department of Transportation ("PennDOT") publication provides an additional exception in situations where the "steel products are used as a construction tool and will not serve a permanent functional use in the project." Pennsylvania Department of Transportation – Specifications, Publication 408/2007-6 at § 106.01 (Change No. 6, Effective April 2, 2010).

Appellant Mabey is a Delaware corporation engaged in the business of supplying temporary steel bridges for construction projects.[2] These bridges are designed to handle traffic and pedestrians while a construction project is underway. Mabey's bridges are made of steel from the United Kingdom.

Mabey has supplied temporary bridges to contractors for use in public works projects, including PennDOT projects, for more than 20 years. Over that time, Mabey estimates that it has provided temporary bridges for use on approximately fifty PennDOT projects. Mabey asserts that its bridges have always performed to specification, and it provided documentation showing PennDOT considered it an "approved temporary bridge fabricator." Not until 2010, however, did PennDOT raise the issue of whether Mabey's bridges were prohibited under the Steel Act.

In December 2009, Mabey provided a quote for a temporary bridge to a contractor for purposes of a bid on a PennDOT project. The contractor's bid was accepted and it subcontracted with Mabey to provide the bridge. The bridge specifications were submitted to a PennDOT engineer, and the engineer approved the bridge for use on the project.

---

[2] Because we are reviewing a grant of summary judgment, we recite the facts in the light most favorable to Mabey, the nonmoving party. *Couden v. Duffy*, 446 F.3d 483, 489 n.1 (3d Cir. 2006).

4

On April 29, 2010, however, PennDOT notified the contractor that the Steel Act precluded the use of Mabey's temporary bridge on the project because the bridge is made of foreign steel. The following month, PennDOT's Chief Bridge Engineer sent an e-mail to all district engineers notifying them that foreign steel is not to be used for the construction of temporary bridges, and instructing them to review all projects that specify the use of a temporary bridge and incorporate a "special provision" codifying this requirement. Likewise, on June 16, 2010, PennDOT sent a letter to the contractor concluding that a temporary bridge (1) is itself a "public work" within the meaning of the Steel Act and thus its steel components must be manufactured in the United States; and (2) does not qualify for the exception for products used as a construction tool that will not serve a permanent functional use in the project. The letter concluded that "[t]he use of the Mabey Bridge, to the extent it does not contain steel that is of domestic manufacture, seems ruled out by the Act." Because of these actions, Mabey claims it has been forced to cancel four contracts for temporary bridges on PennDOT projects, and prevented from giving quotes to contractors for bids on future projects.

On July 16, 2010, Mabey filed suit in the United States District Court for the Middle District of Pennsylvania against Allen Biehler, Secretary of Transportation for the Commonwealth of Pennsylvania. Mabey sought a declaration that the Steel Act, as interpreted and enforced by PennDOT, is unconstitutional. Mabey also requested a preliminary and permanent injunction enjoining PennDOT from prohibiting the use of Mabey's temporary bridges on its projects. The District Court granted the Secretary's motion for summary judgment on all of Mabey's claims. This appeal followed.

**II.**

The District Court had jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343. We have jurisdiction pursuant to 28 U.S.C. § 1291. We exercise plenary review over a district court's grant of summary judgment, *Monroe v. Beard*, 536

F.3d 198, 206 (3d Cir. 2008), and will affirm only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law," Fed. R. Civ. P. 56(a). We exercise *de novo* review over the preemption question, *Farina v. Nokia Inc.*, 625 F.3d 97, 115 n.20 (3d Cir. 2010), as well as over a district court's interpretation of the Constitution, *Blackhawk v. Pennsylvania*, 381 F.3d 202, 206 (3d Cir. 2004). We will address each of Mabey's four constitutional claims in turn.

## A.

Mabey's primary contention on appeal is that the Steel Act is preempted by the Buy America Act, 23 U.S.C. § 313, and related federal regulations. The doctrine of preemption is rooted in the Supremacy Clause of the United States Constitution, which declares that the laws of the United States "shall be the supreme Law of the Land; . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2; *Bruesewitz v. Wyeth, Inc.*, 561 F.3d 233, 238 (3d Cir. 2009). Courts have recognized three different kinds of preemption: express preemption, conflict preemption, and field preemption. *Elassaad v. Independence Air, Inc.*, 613 F.3d 119, 126 (3d Cir. 2010). As we have explained:

> Express preemption requires that Congress's intent to preempt be explicitly stated in the statute's language or implicitly contained in its structure and purpose. Conflict preemption occurs when state law actually conflicts with federal law, such that it is impossible for a private party to comply with both state and federal requirements, or where state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress. Field preemption occurs when a field is reserved for federal regulation, leaving no room for state regulation, and congressional intent to supersede state laws is clear and manifest.

6

*Id.* (internal alteration, quotation marks, and citations omitted). "In analyzing a potential conflict between federal and state law, we must be guided by the rule that the purpose of Congress is the ultimate touchstone in every preemption case." *Deweese v. Nat'l R.R. Passenger Corp.*, 590 F.3d 239, 246 (3d Cir. 2009) (internal alteration and quotation marks omitted). Furthermore, we "consider the entire scheme of the federal statute and identify its purpose and intended effect."[3] *Id.* (internal alteration and quotation marks omitted).

The Buy America Act provides that the Secretary of Transportation shall not obligate federal funds for highway and transit projects "unless steel, iron, and manufactured products used in such project[s] are produced in the United States." 23 U.S.C. § 313(a). In contrast to the Steel Act, the Buy America Act provides a more extensive set of exceptions to the domestic production requirement, providing that the statute's provisions do not apply where the Secretary finds: "(1) that their application would be inconsistent with the public interest; (2) that such materials and products are not

[3] Generally, in analyzing a preemption question, we are guided by "the basic assumption that Congress did not intend to displace state law"—referred to as the "presumption against preemption." *Farina*, 625 F.3d at 116. Mabey, however, disputes the applicability of the presumption in cases involving foreign commerce issues, relying on decisions stating that the presumption does not apply when the state law touches an area "where state regulation has traditionally been absent," *id.*, or "when the State regulates in an area where there has been a history of significant federal presence," *United States v. Locke*, 529 U.S. 89, 108 (2000). We note that we have previously applied the presumption in a preemption challenge to the Steel Act, albeit on other grounds. *Trojan Techs., Inc. v. Pennsylvania*, 916 F.2d 903, 906 (3d Cir. 1990) (noting that state procurement policy is a field of traditional state regulation). Here, however, we have little difficulty concluding the Steel Act is not preempted without the need to resort to the presumption.

produced in the United States in sufficient and reasonably available quantities and of a satisfactory quality; or (3) that inclusion of domestic material will increase the cost of the overall project contract by more than 25 percent." *Id.* § 313(b). The regulations also provide for a *de minimis* exception to the Act, where the cost of the foreign steel or iron materials does not exceed certain benchmarks. 23 C.F.R. § 635.410(b)(4).

Importantly, the regulations also contain a provision that indicates that the Buy America requirements are satisfied when the project "[i]ncludes no *permanently incorporated* steel or iron materials." *Id.* § 635.410(b)(1) (emphasis supplied). From this provision, Mabey contends that, while its temporary bridges are prohibited under Pennsylvania's Steel Act, they are exempted from the domestic steel requirements of the federal law because they are not permanently incorporated in the underlying project.[4] Mabey argues that the Buy America Act's "tempered and limited application" of the domestic steel requirement, including its exception for temporary steel items, preempts the Steel Act's more restrictive requirements. Thus, the relevant question before us is whether the federal law provides only a "floor"—minimum requirements which the states are free to exceed if they wish—or whether the federal standards are intended to be uniform throughout the country, invalidating more restrictive state requirements.

---

[4] Mabey's position that its temporary bridges would be exempted from the application of Buy America Act under this provision finds support in certain Federal Highway Administration documents. *See* FHWA Contract Administration Core Curriculum Participant's Manual and Reference Guide 2006 at 59 (stating that, "[f]or the Buy America requirements to apply, the steel or iron products must be permanently incorporated into the project. Buy America does not apply to temporary steel items, e.g., . . . temporary bridges"). For the purposes of this appeal, we will assume, without deciding, that Mabey's bridges would be permissible under the Buy America Act.

8

We conclude that the Buy America Act demonstrates Congress's intent to allow states to enact more restrictive requirements related to the use of domestic steel and, thus, that the Steel Act is not preempted. In the same section that contains the domestic steel requirement, the Buy America Act also states:

> The Secretary of Transportation shall not impose any limitation or condition on assistance provided under the Surface Transportation Assistance Act of 1982 (96 Stat. 2097) or this title *that restricts any State from imposing more stringent requirements than this section on the use of articles, materials, and supplies mined, produced, or manufactured in foreign countries* in projects carried out with such assistance or restricts any recipient of such assistance from complying with such State imposed requirements.

23 U.S.C. § 313(d) (emphasis supplied). Mabey argues that this section is inapplicable because "it is only a restriction on the power of the Secretary of Transportation, not an affirmative grant of power to the states." Appellant's Br. at 32. This argument, however, misses the point. The touchstone of the preemption analysis is whether Congress intended to displace state law. The statutory language, far from demonstrating an intent to preempt state law, instead demonstrates that Congress was aware that individual states may have "more stringent requirements" than the Buy America Act, and specifically instructed the Secretary of Transportation not to interfere with those requirements. Such an instruction is tantamount to congressional authorization for more stringent state practices to continue. Under such circumstances, there can be no preemption. *See Wyeth v. Levine*, 555 U.S. 555, 574-75 (2009) (noting that the case for federal preemption is particularly weak where Congress has demonstrated awareness of the operation of state law but has not acted).

Mabey seeks to avoid the language of 23 U.S.C. §

9

313(d) by instead relying principally on the federal regulations implementing the Buy America Act, particularly 23 C.F.R. § 635.409(b).  That section provides that:

> *No requirement shall be imposed* and no procedure shall be enforced by any State transportation department in connection with a project which may operate: . . . (b) *To prohibit, restrict or otherwise discriminate against the use of articles or materials of foreign origin to any greater extent than is permissible under policies of the Department of Transportation* as evidenced by requirements and procedures prescribed by the FHWA Administrator to carry out such policies.

23 CFR § 635.409(b) (emphasis supplied).  Mabey argues that this provision shows that federal law "clearly prohibits states from imposing Buy America requirements that are inconsistent with federal policy, including the policy of expressly exempting temporary bridges from the domestic steel requirements."  Appellant's Br. at 33.

Mabey correctly points out that "an agency regulation with the force of law can pre-empt conflicting state requirements."  *Levine*, 555 U.S. at 576.  We are skeptical, however, as to whether a regulation can be used to support preemption in contravention of clear statutory language demonstrating Congress's intent *not to preempt* state law, such as that found in § 313(d).  In any case, we find Mabey's reliance on the regulations unavailing.

Whatever support § 635.409(b), standing alone, may provide for Mabey's argument, we cannot view that regulation in isolation but, rather, must examine how it fits into the larger regulatory scheme.  *Deweese*, 590 F.3d at 246 (a court must examine "the entire scheme" of the federal law at issue).  Of particular importance here is another regulation in the same subpart, 23 C.F.R. § 635.410, entitled "Buy America requirements."  That regulation provides:

10

(b) No Federal-aid highway construction project is to be authorized for advertisement or otherwise authorized to proceed unless at least one of the following requirements is met:

(1) The project either: (i) Includes no permanently incorporated steel or iron materials, or (ii) if steel or iron materials are to be used, all manufacturing processes . . . for these materials must occur in the United States. . . . [or;]

(2) The State has standard contract provisions that require the use of domestic materials and products, including steel and iron materials, *to the same or greater extent as the provisions set forth in this section*.

*Id*. § 635.410(b)(1)–(2) (emphasis supplied). Thus, echoing the Buy America statute, § 635.410(b)(2) contemplates that states may have more stringent requirements regarding the use of domestic steel materials than the federal law, and explicitly allows these more stringent requirements to satisfy the federal Buy America requirements.

We need not decide whether §§ 635.409(b) and 635.410(b)(2) conflict, or how they operate together in practice. To the extent there is any conflict between the two, § 635.410 explicitly provides that "[t]he provisions of this section shall prevail and be given precedence over any requirements of this subpart which are contrary to this section," thus trumping the operation of § 635.409(b) relied upon by Mabey. *Id*. § 635.410(a). Even without the express precedence of § 635.410, we note that the two regulations read in conjunction could, at best, be said to be ambiguous on the issue of more restrictive state requirements. An ambiguous regulatory scheme, however, cannot demonstrate the clear congressional intent necessary to establish preemption of state law.

In sum, we conclude that the Buy America Act,

11

together with 23 C.F.R. § 635.410(b)(2), demonstrate a federal legislative and regulatory scheme that takes into account concurrent state legislation in this area, and authorizes the states to impose more stringent requirements on the domestic manufacture of steel products. Congress neither expressly preempted state law, nor exclusively occupied the field of regulation of domestic steel requirements in public works projects. Furthermore, because Congress contemplated more restrictive state regulations, we cannot conclude that state law stands as an obstacle to the accomplishment of congressional objectives. The Steel Act is, therefore, not preempted by federal law.

**B.**

Mabey argues, next, that the Steel Act is unconstitutional under the dormant Commerce Clause. The Commerce Clause "grants Congress plenary authority to regulate commerce among the states, and 'has long been understood to have a 'negative' aspect that denies the States the power unjustifiably to discriminate against or burden the interstate flow of articles of commerce.'" *Tri-M Group, LLC v. Sharp*, 638 F.3d 406, 418 (3d Cir. 2011) (quoting *Oregon Waste Sys., Inc. v, Dep't of Envtl. Quality*, 511 U.S. 93, 98 (1994)). A state regulation that discriminates against interstate commerce in favor of local business or investment is *per se* invalid, unless it survives rigorous scrutiny. *Cloverland-Green Spring Dairies, Inc. v. Pa. Milk Mktg. Bd.*, 298 F.3d 201, 210-11 (3d Cir. 2002). Where, as here, a state law touches on "'the unique context of foreign commerce,' [the] State's power is further constrained because of 'the special need for federal uniformity.'" *Barclays Bank PLC v. Franchise Tax Bd. of Cal.*, 512 U.S. 298, 311 (1994) (quoting *Wardair Can. v. Fla. Dep't of Revenue*, 477 U.S. 1, 8 (1986)). A state law is immune from attack under the Commerce Clause, however, if certain exceptions apply, including where the state is acting as a "market participant" rather than a market regulator, or where Congress "authorize[s] states to impose restrictions that the dormant Commerce Clause would otherwise forbid." *Tri-M Group*, 638 F.3d at 418, 430.

12

Mabey argues that neither exception to the Commerce Clause applies in this case, and that the Steel Act cannot withstand the heightened scrutiny that applies to laws that facially discriminate against foreign commerce. In particular, Mabey argues that Congress has not clearly authorized the states to discriminate against foreign steel, and that the market participant doctrine is wholly inapplicable in the context of foreign commerce. Mabey also argues that, even if the market participant exception is available, PennDOT acts as a market regulator, not a participant, in implementing the Steel Act.

**1.**

In analyzing Mabey's claim under the Commerce Clause, we do not write on a clean slate; indeed, we previously addressed a Commerce Clause challenge to the Steel Act in *Trojan Techs., Inc. v. Pennsylvania*, 916 F.2d 903 (3d Cir. 1990). In *Trojan*, appellant Trojan Technologies was a Canadian corporation that manufactured and supplied ultraviolet light water disinfection systems, which contained various steel parts. These devices were sold to municipalities and authorities for use in public works projects such as waste water and sewage treatment facilities. The Pennsylvania Attorney General, however, sought documentation from the company that the devices complied with the Steel Act. Trojan responded by filing suit claiming the Act was unconstitutional, in part because it burdened foreign commerce in violation of the Commerce Clause.

On appeal, we agreed with the district court that the Steel Act did not violate the Commerce Clause. We began by noting that the Supreme Court had "expressly reserved the question of whether state buy-American statutes that affect foreign commerce violate the commerce clause, or are permissible under the market participant doctrine or on other grounds." *Id.* at 910 (citing *Reeves, Inc. v. Stake*, 447 U.S. 429, 437 n.9 (1980)). We independently concluded, however, that the "market-participant" exception to the Commerce Clause did apply to the Steel Act, stating: "we are convinced that with respect to state buy-American statutes there can be no commerce clause intrusion even in a foreign commerce

context where there is no attempt to regulate." *Id*. We rejected an argument that the exception did not apply to the Steel Act because the disinfection systems were purchased by municipalities, rather than directly by the Commonwealth itself. Relying on the Supreme Court's decision in *White v. Massachusetts Council of Construction Employers, Inc.*, 460 U.S. 204 (1983), we found it immaterial that the Commonwealth was not in formal privity of contract with the suppliers. Rather, we held that, "[a]s the ultimately controlling public purchaser, the Commonwealth enjoys the same right to specify to its suppliers the source of steel to be used in any supplies provided as is enjoyed by similarly situated private purchasers." *Trojan*, 916 F.2d at 911. Finally, we acknowledged that statutes affecting foreign commerce are subject to more searching review. Nevertheless, we concluded that the Steel Act "survives even the most searching review," noting that the Act does not implicate the concerns of multiple taxation or impairment of federal uniformity that apply to state statutes affecting foreign commerce. *Id*. at 912.

*Trojan* is directly on-point and forecloses Mabey's claim under the Commerce Clause. Moreover, Mabey's attempts to distinguish *Trojan* are unpersuasive. First, Mabey's argument that *Trojan* did not involve the federal Buy America Act is irrelevant for the purposes of the market participant analysis. Second, the fact that *Trojan* involved ultraviolet water disinfection devices installed at water and sewage treatment facilities, while this case involves temporary bridges for road projects, is likewise immaterial. Mabey contends that Pennsylvania builds and repairs roads "in its sovereign capacity and in the exercise of its statutory authority," making it a market regulator under the facts of this case, not a market participant. Appellant's Br. at 40. But Mabey provides no persuasive reason why the state's exercise of its authority regarding roads should be treated any differently than its exercise of authority regarding water and sewage treatment facilities and waste management. Finally, Mabey argues that PennDOT acts as a market regulator because it can enforce the Steel Act with powers that are unavailable to private actors, such as disgorgement

proceedings and debarment from public contracts. In *Trojan*, however, we explicitly cited to those same statutory powers yet still found that the Commonwealth acted as a market participant. *See Trojan*, 916 F.2d at 905 (citing 73 Pa. Cons. Stat. § 1885 and noting that payments made in violation of the Act are recoverable directly from the contractor or supplier who did not comply and that willful violators are barred from bidding on public contracts for 5 years).

**2.**

Even if we were not constrained by *Trojan*, Mabey's Commerce Clause claim would fail because the Steel Act is subject to the congressional authorization exception. "'When Congress so chooses, state actions which it plainly authorizes are invulnerable to constitutional attack' since Congress's commerce power in such instances is 'not dormant, but has been exercised by that body.'" *Tri-M Group*, 638 F.3d at 430 (quoting *Ne. Bancorp, Inc. v. Bd. of Gov'rs of Fed. Reserve Sys.*, 472 U.S. 159, 174 (1985)); *see also Norfolk S. Corp. v. Oberly*, 822 F.2d 388, 392-93 (3d Cir. 1987) ("One defense to a dormant Commerce Clause challenge is Congressional consent. By its actions, Congress may . . . permit[] the states to regulate the commerce in a manner which would otherwise not be permissible." (internal quotation marks omitted)).[5]

---

[5] Mabey points out that, in order to invoke this exception, a state typically must prove congressional authorization that is "unmistakably clear." *Tri-M Group*, 638 F.3d at 430. The Supreme Court has stated, however, that in the case of foreign commerce, "unmistakable clarity" is not required. *See Barclays Bank*, 512 U.S. at 323 ("Congress may more passively indicate that certain state actions do *not* impair federal uniformity [in foreign commerce] . . . it need not convey its intent with the unmistakable clarity required to permit state regulation that discriminates against interstate commerce . . . ."). Instead, it may be enough where the federal government "has at least acquiesced" to the state activity in question. *See Wardair*, 477 U.S. at 12. In this case, however, the question of the precise standard to apply is immaterial given that the congressional authorization here is

We conclude that Congress has plainly authorized restrictions of the kind contained in the Steel Act. As noted in the discussion of preemption, *supra*, 23 U.S.C. § 313(d) shows that Congress was aware that state laws imposed more stringent requirements on the use of foreign materials and specifically commanded the Secretary of Transportation not to restrict any state from imposing more stringent requirements. Likewise, 23 C.F.R. § 635.410(b) allows a state to exceed the federal baseline for the use of domestic steel by "requir[ing] the use of domestic materials and products, including steel and iron materials, to the same or greater extent as the provisions set forth in this section." These provisions show the type of unequivocal congressional authorization needed to avoid Commerce Clause scrutiny. The District Court correctly granted summary judgment against Mabey on its Commerce Clause claim.

## C.

Mabey next contends that PennDOT's actions violated the Contract Clause, which provides that "[n]o State shall . . . pass any . . . Law impairing the Obligation of Contracts." U.S. Const. art. I, § 10, cl. 1. In order to prove a violation of this constitutional provision, Mabey must demonstrate that a "change in state law has 'operated as a substantial impairment of a contractual relationship.'" *Gen. Motors Corp. v. Romein*, 503 U.S. 181, 186 (1992) (quoting *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 244 (1978)). "This inquiry has three components: whether there is a contractual relationship, whether a change in law impairs that contractual relationship, and whether the impairment is substantial." *Id.* Thus, under the Contract Clause, the contract in question must preexist the passage of the state law. *See id.*; *see also Fabri v. United Techs. Int'l, Inc.*, 387 F.3d 109, 124 (2d Cir. 2004) ("The Contract Clause prohibits the impairment by the state of existing contracts. . . . [T]he statute must have been passed after the contract was executed."). Only if these elements are met do we "further inquire whether the law at issue has a

unmistakably clear.

16

legitimate and important public purpose and whether the adjustment of the rights of the parties to the contractual relationship was reasonable and appropriate in light of that purpose." *Transp. Workers Union of Am., Local 290 v. SEPTA*, 145 F.3d 619, 621 (3d Cir. 1998).

We agree with the District Court that Mabey has failed to show a "change in state law" that impaired its contracts. The Steel Act was enacted in 1978 and was in effect at the time Mabey entered into its contracts to provide temporary bridges for PennDOT projects. Thus, even Mabey concedes that the passage of the statute itself cannot be the "change in law" that impaired Mabey's existing contracts. Rather, Mabey argues that "PennDOT's change in its interpretation of [the Steel Act] meets the purposes behind the requirement of a change in state 'law.'" Appellant's Br. at 54.

The Supreme Court has made clear that the language of the Contract Clause (*i.e.*, "pass any . . . law") means that the clause applies only to exercises of legislative power. As the Court noted in *Ross v. Oregon*, "[t]he prohibition is aimed at the legislative power of the state, and not at the decisions of its courts, or the acts of administrative or executive boards or officers, or the doings of corporations or individuals." 227 U.S. 150, 162 (1913) (quoting *New Orleans Waterworks Co. v. La. Sugar Ref. Co.*, 125 U.S. 18, 30 (1888)). The Court has cautioned, however, that the application of the Contract Clause is not limited solely to formal enactments and statutes of the state legislature. Instead, it "reach[es] every form in which the legislative power of a state is exerted, whether it be a constitution, a constitutional amendment, an enactment of the legislature, a by-law or ordinance of a municipal corporation, or a regulation or order of some other instrumentality of the state exercising delegated legislative authority." *Id*. at 162-63.

There is no simple formula for determining whether a government act is an exercise of legislative authority. In *Ross*, however, the Supreme Court provided some guidance to courts for purposes of making that determination. In particular, the Court stated that an act bears the hallmarks of

17

legislative authority when it "changes existing conditions by making a new rule to be applied thereafter to all or some part of those subject to its power." *Id*. at 163. In contrast, an act is likely *not* legislative when "its purpose was not to prescribe a new law for the future, but only to apply to a completed transaction laws which were in force at the time." *Id*. Thus, there is no violation of the Contract Clause when the act in question "investigates, declares, and enforces liabilities as they stand on present or past facts and under laws supposed already to exist." *Id*. Although *Ross* was decided in a much earlier time, and the line between legislative and non-legislative acts has arguably blurred since that time, the guidance provided by that case remains helpful in analyzing the legislative character of exercises of state power.

We are troubled by the fact, and fact it appears to be, that because PennDOT and Mabey had a long course of dealing, Mabey could justifiably believe that its bridges made with foreign steel were acceptable. Nevertheless, in light of *Ross*, we conclude that PennDOT's actions were not an exercise of legislative authority. Although those actions had great consequences for Mabey, PennDOT's decision regarding temporary bridges was not truly a "new rule." Rather, at least since 1978, the applicable "rule" is, and has been, the Steel Act. PennDOT's actions are better characterized as interpretive. PennDOT was not exercising *its* authority to create regulations. It did not engage in formal, notice-and-comment rule making. Instead, PennDOT, in the words of *Ross*, simply "declare[d], and enforce[d] liabilities as they stand on present or past facts and under laws supposed already to exist." *Id*. Indeed, PennDOT's written action letter discussing the issue of Mabey's bridges clearly indicates that it was applying and interpreting the rule set forth in the Steel Act:

> A temporary bridge is explicitly included in the [Steel] Act's definition of 'public works.' (Section 6 of the Act, 73 P.S. § 1886, defines 'public works' as 'any structure, building, highway, waterway, street, ***bridge***, transit system, airport, or other betterment, work or

18

improvement ***whether of a permanent or temporary nature*** . . . .' (Emphasis added).) The temporary bridge . . . is; therefore, ***not*** merely a tool used in the construction of a 'public work' (i.e., the permanent replacement bridge), but it is a 'public work' in its own right. . . . All steel products used in the construction of either bridge must, under the Act, be manufactured from steel made in the U.S. . . . The use of the Mabey Bridge, to the extent it does not contain steel that is of domestic manufacture, seems ruled out by the Act.

(JA 73-74.)

The fact that PennDOT's application of the Steel Act in 2010 reversed or contradicted its previous interpretation of the Act is insufficient. The Supreme Court has rejected the argument that the Contract Clause is violated when there is a new interpretation of an antecedent state statute. *See Fleming v. Fleming*, 264 U.S. 29, 30-32 (1924) (finding no Contract Clause violation based on the alleged reversal in interpretation of an Iowa state statute, even where the party had relied on the earlier interpretation, and holding that a "statute in force when a contract was made cannot be made a subsequent statute through new interpretation by the courts" (citing *Tidal Oil Co. v. Flanagan*, 263 U.S. 444 (1924))); *Stockholders of Peoples Banking Co. v. Sterling*, 300 U.S. 175, 182 (1937) ("Change by judicial construction of antecedent legislation does not impair a contract, at least in the forbidden sense, if it be granted arguendo that such a change can be discovered."). Because PennDOT's actions interpreted and applied a law that had been in force for over 30 years, it did not exercise legislative authority subject to scrutiny under the Contract Clause. The District Court thus properly granted summary judgment on the Contract Clause claim.

## D.

Mabey's final claim is that PennDOT's application of the Steel Act violates the Equal Protection Clause. Mabey's

argument is two-fold. Based on *Metropolitan Life Ins. Co. v. Ward*, 470 U.S. 869, 882 (1985), Mabey argues that discriminating against out-of-state business does not serve a legitimate state purpose. As we noted in *Trojan*, however, *Metropolitan Life* has been "sharply limited to its facts." 916 F.2d at 915 (discussing *Ne. Bancorp., 472* U.S. at 180 ). Because *Trojan* considered the Steel Act in the context of *Metropolitan Life* and found "no basis for concluding that the Steel Act contravenes the equal protection clause," *Trojan*, 916 F.2d at 915, Mabey's argument is unavailing.

Mabey also argues that PennDOT's "distinction between temporary bridges and other temporary items is not rationally related to a legitimate purpose, in violation of the Equal Protection Clause." Appellant's Br. at 58. In other words, Mabey claims that PennDOT impermissibly allows an exception to the domestic steel requirement "for scaffolding, construction trailers, or cranes used in PennDOT projects," *id*. at 59, but does not allow a similar exception for Mabey's bridges.

Because Mabey concedes that the distinction drawn by PennDOT does not touch on a suspect class or infringe fundamental constitutional rights, it must be upheld "if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." *Alexander v. Whitman*, 114 F.3d 1392, 1407 (3d Cir. 1997) (quoting *F.C.C. v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313 (1993)). This is a "relatively relaxed standard reflecting the Court's awareness that the drawing of lines that create distinctions is peculiarly a legislative task and an unavoidable one." *Id*. at 1407-08 (quoting *Mass. Bd. of Ret. v. Murgia*, 427 U.S. 307, 314 (1976)). Under rational basis review, a "statute is presumed constitutional . . . and the burden is on the one attacking the legislative arrangement to negative every conceivable basis which might support it, whether or not the basis has a foundation in the record." *Heller v. Doe*, 509 U.S. 312, 320-21 (1993) (internal citations and quotation marks omitted).

Mabey has not met its heavy burden of overcoming the presumption of constitutionality, and surely has not negated

every possible justification for the distinction. Appellee notes that temporary bridges are specifically-required items in certain PennDOT projects, whereas scaffolding, trailers and cranes are items that are used or not at the discretion of the contractor. A state agency could rationally determine that application of domestic steel requirements to items used at the discretion of the contractor is too onerous and difficult to enforce. Ultimately, the kind of fine distinctions drawn by PennDOT with respect to the Steel Act are precisely the kind of judgments that the Supreme Court has instructed courts not to second-guess. As the Court has stated:

> [R]estraints on judicial review have added force where the legislature must necessarily engage in a process of line-drawing. Defining the class of persons subject to a regulatory requirement . . . inevitably requires that some persons who have an almost equally strong claim to favored treatment be placed on different sides of the line, and the fact [that] the line might have been drawn differently at some points is a matter for legislative, rather than judicial, consideration.

*Beach Commc'ns,* 508 U.S. at 315-16 (internal citations and quotation marks omitted). In sum, we find no basis for concluding that the distinction drawn by PennDOT contravenes the Equal Protection Clause.

### III.

For the foregoing reasons, we will affirm District Court's grant of summary judgment.

21